Argued June 7; affirmed July 6, 1939

# SILVERTOOTH *v.* KELLEY ET AL.

(91 P. (2d) 1112)

In Banc.

*Lawrence T. Harris*, of Eugene (Harris & Bryson and E. O. Immel, all of Eugene, and Hoy & Prag, of Portland, on the brief), for appellants.

*Irving Rand*, of Portland (Galloway & Krier, of The Dalles, on the brief), for respondent.

BELT, J. This is an action, tried by the court without the intervention of a jury, to recover the reasonable value of services alleged to have been rendered by plaintiff in procuring a purchaser for the stock of Horse Heaven Mines, Inc.

Plaintiff alleges that the defendant stockholders employed him to sell or procure a purchaser for all the stock in the above named corporation; that, pursuant to such employment, he did procure a purchaser who agreed to pay to defendants $200,000 for the stock owned by them; and that the reasonable value of his services is the sum of $10,000. The answering defendants, by separate pleadings, denied the alleged employment of the plaintiff and the reasonable value of his services. It was affirmatively alleged that, assuming plaintiff was their agent, he was not entitled to compensation for any alleged services in that he acted in conflict with the interests of his employers. This affirmative matter—to which attention will later be directed—was denied by the plaintiff in his reply.

No service could be had on the defendant R. R. Whiting, Jr., and no appearance was made by him. The action was dismissed as to the defendant D. W. Green for the reason that he had nothing whatever to do with the employment of the plaintiff or with the ratification thereof.

A joint and several judgment was entered against the other defendants in favor of plaintiff for the sum of $10,000, together with interest thereon from August 28, 1936—date of consummation of sale of stock. From such judgment, defendants E. W. Kelley and Harry O. Hoy appeal.

The facts, briefly stated, out of which this action arose are as follows:

Horse Heaven Mines, Inc., was organized in 1934 as a corporation, having a capital stock of 75,000 shares of the par value of $1.00 per share, for the purpose of operating and developing certain cinnabar mining property about 26 miles from Antelope in Wasco county, Oregon. At the time of the alleged employment of plaintiff in April, 1935, E. W. Kelley, D. W. Green, R. R. Whiting, Isabel K. Whiting, R. R. Whiting, Jr., Harry O. Hoy (improperly pleaded as Harry G. Hoy, Jr.), Robert M. Betts (now deceased) and C. C. Hayes were the owners of all the capital stock. Thereafter, and prior to the sale in question, defendant Kelley purchased the 15,750 shares of stock owned by Hayes for $5,000, thereby becoming the owner of 53 per cent of the stock in the company.

The company soon ran into serious financial difficulties. Its application for a loan from the Reconstruction Finance Corporation had been rejected; dissatisfaction arose among the stockholders and, in March, 1935, there was much talk of selling the mine. Accord-

ing to the testimony of C. C. Hayes, he saw the defendant Kelley, president of the company, at Eugene, Oregon, early in April, 1935, about selling the mine and the latter said "to go ahead and sell it." Hayes further said that Kelley told him that he was agreeable to the price "Mr. Betts and the rest of us set up which I believe was $75,000." Hayes at this time was manager of the mine. While on the way back to the mine from Eugene, he saw Herbert Wilson about selling the property as Wilson had been successful in bringing about the sale of the Oregon King mine. Wilson insisted that if he was to handle the deal it was necessary to have an option. Hayes informed the defendant Kelley of such request and an option for 30 days, dated April 4, 1935, was executed by Kelley authorizing Wilson to purchase all the stock in the company for the sum of $75,000. This option was never exercised, and a few days after it terminated Hayes contacted the plaintiff in reference to the sale of the mine. The plaintiff operated a combined drug store, confectionery, and barber shop at Antelope. He was an "old-timer" in that section of the state and was well acquainted with people engaged in mining operations. Hayes testified that he told the plaintiff that Wilson had worked on the sale of the mine but that his option had expired and that he asked plaintiff if he thought "he could dispose of the mine and he said he believed he could." In this conversation there was no definite agreement as to the sale price of the mine, except that it could not be less than $75,000, but Hayes said that he told the plaintiff, "The more you can get for us the more commission there will be for you," and that he said, "What will be my commission?" and that he told plaintiff "I suppose the customary commission." Hayes said

that he reported this talk with the plantiff to the defendants R. R. Whiting and Robert Betts and that the latter said, "Go ahead." He also testified that, on two different occasions, he reported the employment of plaintiff to the defendant Kelley. The plaintiff, in testifying about this conversation with Hayes relative to the sale of the mine, said, "All the stock was to be sold and that they had to have $75,000," but that nothing was said about the sale of the stock for any particular person.

Soon after this alleged employment, the plaintiff telephoned to Sam H. Williston at Aberdeen, Washington, urging him to come to Antelope and look the property over. Williston was a representative of the Sun Oil Company which was engaged on a large scale in buying leases and cinnabar mining properties in the West. Williston was a very busy man and said that he "stalled" the plaintiff about going to inspect the mine but that, after persistent efforts on the part of the plaintiff, he accompanied him to the mine during the first part of July, 1935. Williston again went to the mine in August, with mining experts, and made a detailed inspection of the property extending over a period of two weeks. After this inspection, Williston made a favorable report to the Sun Oil Company relative to the purchase of the property. Extended negotiations were thereupon entered into concerning the same which finally resulted in the deal being closed on August 28, 1936, at a purchase price of $200,000 for all the stock. At the time the deal was closed, Williston was requested to sign an affidavit which had been prepared, stating in effect that the plaintiff had not procured the Sun Oil Company to purchase the stock but that the oil company had acted

on its own initiative. Williston refused to sign the affidavit for the reason, as he said, "it was not the truth."

■■ We think the above statement is sufficient as a background for consideration of the questions presented on this appeal. The vital question is whether there is any substantial evidence to support the judgment of the lower court. It is fundamental that, in an action at law thus tried, the findings of the court are equivalent to the verdict of a jury: *Hilker v. Kruse*, 152 Or. 197, 52 P. (2d) 1119; *Lyons v. Lich*, 145 Or. 606, 28 P. (2d) 872; *Glickman v. Bowman*, 143 Or. 229, 21 P. (2d) 1082. As counsel will appreciate, we are not concerned with the weight of the evidence. The evidence must be considered in the light most favorable to plaintiff.

■ The appellants contend that, since plaintiff had no written contract of employment covering his services as a broker or agent to sell real property, as required in section 9-909, Oregon Code 1930, there can be no recovery in this case. The fallacy of such contention lies in the fact that plaintiff was not employed to sell real property, but to sell all the stock in Horse Heaven Mines, Inc. Shares of stock in a corporation are personal property (13 American Jurisprudence 293) even where the property of the corporation consists wholly of real estate: Fletcher Cyc. Corporations (Permanent Edition) § 5096, citing numerous authorities in support of the text. The corporation, Horse Heaven Mines, still has title to the real property. It was the stock in the corporation that was sold. As stated by the trial court, "It is obvious that all parties interested when talking of selling the mine, had in contemplation the sale of stock   *   *   *."

■ Relative to this assignment of error it is also urged that, assuming plaintiff was selling stock and not real property, he had no brokers' license to sell stock as required by section 25-1309, Oregon Code 1930. Plaintiff was not a "broker" as defined in subdivision (c) of section 25-1301, Oregon Code 1930. He was not engaged in the business of selling stocks or securities. It was an isolated sale, not made in the course of repeated and continuing transactions: *State v. Swain*, 147 Or. 207, 31 P. (2d) 745; 32 P. (2d) 773, 93 A. L. R. 921.

■ The second assignment of error is thus stated by appellants:

"If either of these appellants is to be held to be liable to the plaintiff in the full sum of $10,000.00 and interest, as held by the trial court, he is, in effect, except as to the reasonable compensation for services in connection with the sale of his own stock, answering for the debt, default, or miscarriage of another or others; and this the statute of frauds of the State of Oregon will not permit, except that it be shown that he has made a written agreement to be so held and which expresses the consideration." Citing § 9-909 (subd. 2) Oregon Code 1930.

We see no merit in this contention. The statute has no application to the facts in this case. The defendants are original promisors. None of them undertook to answer for the debt, default, or miscarrage of another: *Bailey v. Opp*, 159 Or. 301, 77 P. (2d) 826, 80 P. (2d) 40.

■ It is asserted that no joint and several judgment can be sustained against the defendants since the stock is owned in severalty and no joint promise was made by them, either to employ the plaintiff or to pay him. We think there is substantial evidence tending to show that the sale of all the stock, although owned in severalty, was contemplated by the various stock-

holders. Indeed, Williston, the representative of the Sun Oil Company, testified relative to the purchase of the stock that "if we did not have it all, we did not want any of it." The plaintiff, at the time of his alleged employment, was not asked to sell stock of any particular stockholder, but he was to sell all the stock. If any promise was made it was by the defendants to compensate plaintiff for the sale of all the stock. If the contract was joint, each of the obligors would be liable for the entire commission and, in the event any of the defendants was obliged to satisfy the judgment, the right of contribution would exist. If there is no substantial evidence of a joint promise, then it would follow that the judgment must be reversed.

In determining whether the contract is joint or several, the intention of the parties controls: 12 American Jurisprudence 814. The ownership of the stock in severalty is an important factor, but such fact does not conclusively refute the idea of a joint obligation.

In Williston on Contracts (1st ed.) § 322, the rule is thus stated:

"Following the analogy of the rule of real property that an estate granted to two persons created a joint tenancy rather than a tenancy in common, it was clearly held and, except as changed by statute, the law remains that promises by two or more persons create a joint duty unless the contrary is stated. *'It is a general presumption of law when two or more persons undertake an obligation that they undertake jointly, words of severance are necessary to overcome this primary presumption.' The fact that the interests of the obligors in the contract are diverse, does not prevent the duty from being joint.* But where, as in a subscription paper, the obligors state the amount of the subscription of each, each is liable for only that amount, although there may be no words of severance in the promise. This may be

contrary to early law, but it is supposed to be and doubtless is, in accord with the intention of the parties. And there may be other cases where the interests are so clearly several, that a court will disregard the ordinary presumption. *If by agreement or implication of law the contract of two or more obligors with their obligee is joint, the obligee is entitled to enforce the obligation as a joint one, and is not bound by any agreement, of which he was ignorant, of the obligors severally with one another, that each shall be liable for a ratable share."* (Italics ours.)

In 6 R. C. L. 878 (§ 266) it is said:

In some jurisdictions the rule prevails that an obligation *in solido* will never be presumed. But the general rule is that an obligation entered into by more than one person is presumed to be joint, and that a several responsibility will not arise except by words of severance. In other words, an obligation undertaken by two is presumably joint, in the absence of express words to render it joint and several, or a statute declaring every contract, though joint in its terms, to be several as well as joint. One of the rules for determining whether a contract is joint is whether the interest of the parties in the subject-matter is joint."

In *Hill v. Combs*, 92 Mo. App. 242, it was said:

"Under the common law, where two or more persons undertake the performance of an obligation, the presumption is that the undertaking was joint. Words of express joinder are not necessary for this purpose. Words of severance are required to produce a several responsibility, and in the absence of such words the undertaking is joint and not several." Citing Bliss on Code Plead. § 92; 1 Parsons on Contr. (6th Ed.), p. 11; Pomeroy on Rem. and Rem. Rights, p. 329.

Applying the above legal principles to the facts in the instant case, we are convinced that the contract is

joint since the services rendered by plaintiff were for the joint benefit of all the stockholders, and not for the particular benefit of any one of them: *Wolfenbarger v. Britt*, 105 Neb. 773, 181 N. W. 932, is particularly in point.

■ Defendants urge that plaintiff is precluded from recovery because of his activities in procuring for the Sun Oil Company options on certain mining properties adjacent to Horse Heaven Mines, Inc. The oil company had informed defendants early in the negotiations that, without such adjacent claims, it would not purchase the Horse Heaven mining stock. After such options were secured they were never exercised. Plaintiff, in our opinion, was acting in the best of faith and was doing nothing adverse to the interests of his principals.

■ We are assuming that Hayes was not authorized to employ the plaintiff to sell the stock of all the defendants, but there is ample evidence tending to show that all of them, with the exception of D. W. Green, knew that the plaintiff had been engaged to sell the stock; that over an extended period he had been busily engaged in procuring a purchaser; and that he expected compensation for his services. It is a plain case of ratification of the act of the company's manager Hayes in employing the plaintiff. Why did defendants request from Williston such an affidavit if they were not conscious of some basis for plaintiff's claim for compensation? Furthermore, the record discloses that, at the annual stockholders' meeting on June 11, 1935, there was some discussion about the progress that plaintiff was making in his efforts to sell the mine. Defendants had been unable to sell the mine even for $75,000. We are convinced that it was through the persistent efforts of plaintiff that the Sun Oil Company entered into nego-

tiations with the defendants which finally resulted in a sale of all their stock for $200,000. Defendants were quite willing to accept the fruits of plaintiff's industry. It will not do now for them to say that he was not worthy of his hire. There is no dispute in the evidence concerning the reasonable value of plaintiff's services.

It follows that the judgment of the lower court is affirmed.

RAND, C. J., not sitting.