Argued March 23; affirmed April 24; rehearing denied
May 22, 1934

# STATE *v.* SWAIN

(31 P. (2d) 745, 32 P. (2d) 773)

208

*William B. Murray*, of Portland, for appellant.

*Lotus L. Langley*, District Attorney, and *Charles S. Cohn*, Deputy District Attorney, both of Portland, for the State.

ROSSMAN, J. The portion of the evidence necessary to a consideration of the assignments of error indicate that the Pacific Phosphate & Chemical Company, organized in August, 1931, was a corporation engaged in the fertilizer business, with an office at 210 Postal Building, Portland. The defendant, who testified that he had resided for 12 years in Oregon, owned 350 shares (par value, $10) of its total capitalization of 1,000 shares, and was the president of the corporation. In the fall of 1931 he desired to sell some of his stock, and, on behalf of the corporation, desired to employ some men who would have a financial interest in the corporation. At that time he authorized a firm entitled Allison & McAtee, brokers, to procure prospects for him. This firm daily inserted advertisements in the classified columns of the daily press, under the caption of Business Opportunities, stating: "Want active handy man to work in factory. Owner agrees to pay $125 a month; $450; call 401 Dekum Bldg." Ross Richardson, who resided in Portland, observed these advertisements, called upon the defendant at 401 Dekum building, and, as a result of their conference, purchased from the defendant 40 shares of the capital stock of the corporation at a price of $400, and was given a contract to enter its employ as

a truck man. The stock certificate was delivered to Richardson October 22, 1931, in Multnomah county. N. S. Allen, who also lived in Portland, saw one of these advertisements and called upon the defendant at 401 Dekum building. At the conclusion of a conference October 1, 1931, Allen purchased 30 shares of the defendant's stock at a price of $300, and was given a contract to work in the warehouse of the corporation. This contract was made in Portland. Allen testified that the stock certificate was delivered to him by a Mr. Murray whose office, according to the record, is located in Portland. Karl Nelson, who resides at Aberdeen, Washington, read the aforementioned advertisements, and while in Portland entered into a contract with the defendant on or about August 23, 1931, whereby he agreed to purchase 20 shares of stock in the corporation and was given employment as a salesman. The evidence does not clearly indicate where the purchase price of the stock ($200) was paid, but it is nevertheless readily capable of supporting the conclusion that it was paid in Portland. The stock certificate was handed to Nelson in the state of Washington while he was there on the business of the company, apparently not as the result of a contractual duty, but merely because he and the defendant happened to meet one another there. S. Bernard Passmore, who resides in Portland, saw the aforementioned advertisements, and, in response to them, called upon the defendant. He was taken into the company's employ and while working for it was solicited by the defendant to purchase stock. The defendant, according to Passmore, explained that he had a license from the state authorizing him to sell the securities. When the defendant made these sales he possessed no license

from the corporation department to sell stock. On February 17, 1932, an information of felony was filed in the district court of Multnomah county, upon the complaint of the aforementioned Ross Richardson, charging the defendant with unlawfully selling securi-. ties. February 17, 1932, the defendant was bound over to the grand jury by the district court. At that time there was on file in the superior court of the state of California, for the county of Sacramento, an information charging the defendant with the crime of issuing a check without sufficient funds. March 5, 1932, the governor of this state, having received a requisition from the governor of the state of California for the surrender of the defendant, executed an extradition warrant for his return to California. March 8, 1932, the defendant petitioned the circuit court of this state for a writ of habeas corpus seeking his release from custody under the extradition warrant. March 11, 1932, the circuit court dismissed the petition and remanded the defendant into custody for return to the state of California. March 19, 1932, the defendant plead guilty to the charge pending against him in the aforementioned California court, and, on June 7, 1932, was sentenced to confinement in a penitentiary for two and one-half years, the sentence to be suspended, however, after the defendant had served three months in the Sacramento county jail. Before the expiration of the March, 1932, term, the circuit court of Multnomah county made an order reciting that good cause having been shown, the hearing of the charge against the defendant was continued to the April term; in like manner the charge was continued from the April to the May term, and from the May to the June term. June 24, 1932, the grand jury of Multnomah county returned against the defendant the indictment with which we

are now concerned. September 11, 1933, when the defendant returned to our state, he was arrested upon the charge stated in the indictment; September 15, he was arraigned; October 6, he plead "not guilty", and on October 23 the cause was tried.

The first assignment of error submits that the circuit court erred when it denied the defendant's motion to dismiss the indictment which was based upon the following contentions: (1) The defendant was denied a speedy trial as provided by amendment 6 to the federal constitution; (2) the indictment was not found at the next term of court after the entry of the district court's order holding the defendant to the grand jury, as provided by section 13-1601, Oregon Code 1930; (3) the defendant was not tried at the next term of court after the indictment was found, as provided by section 13-1602, Oregon Code 1930; (4) the prosecution of the cause was discontinued; and (5) the state "waived its right and is barred from prosecuting the defendant in the above entitled case and cause".

■ Let us consider the merits of these contentions. The first assumes that the sixth amendment to the federal constitution which guarantees an accused "the right to a speedy and public trial" has application to trials in the Oregon courts. The contrary has been twice held by this court. We quote from *State v. Bailey*, 115 Or. 428 (236 P. 1053):

"Among his alleged reasons for attacking the statute is his assertion that it violates the fifth and sixth amendments of the United States Constitution. This contention may be dismissed with the observation that these provisions contain no restriction upon the powers of the State to legislate: State v. Laundy, 103 Or. 443, 204 P. 958, 206 P. 290, and authorities there cited."

In *State v. Gaetano* 96 Conn. 306 (114 Atl. 82, 15 A. L. R. 458), the court expressly held that the sixth amendment has no application to proceedings in state courts. We dismiss this contention as lacking merit.

■ The second contention is based upon section 13-1601, Oregon Code 1930, which provides:

"When a person has been held to answer for a crime, if an indictment be not found against him at the next term of the court at which he is held to answer, the court must order the prosecution to be dismissed, unless good cause to the contrary be shown."

It will be recalled that February 17, 1932, the defendant was held by the district court to answer to the grand jury, and that during the March, April and May terms of the circuit court the court entered orders which, after stating that good cause had been shown, continued the charge against the defendant to the next term. These orders sufficed to supply the "good cause" required by this section of our laws to prevent dismissal of the prosecution, and are not subject to collateral attack: *State v. Maltzner,* 140 Or. 128 (13 P. (2d) 347). We find no merit in this contention.

■ The third proposition submits that section 13-1602, Oregon Code 1930, was violated when the defendant was not tried at the term of court immediately following the one in which the indictment was found. This section of our laws provides:

"If a defendant indicted for a crime, whose trial has not been postponed upon his application or by his consent, be not brought to trial at the next term of the court in which the indictment is triable, after it is found, the court must order the indictment to be dismissed, unless good cause to the contrary be shown."

It will be recalled that the indictment was returned against the defendant June 24, 1932, and that on June

7, 1932, the superior court of the state of California for the county of Sacramento had sentenced him to incarceration in a California penitentiary for two and one-half years, the penitentiary sentence to be suspended, however, after the defendant had been confined for three months in the county jail of Sacramento county. Section 25-1320 authorizes courts to impose a five-year penitentiary penalty as punishment for the crime charged against this defendant. Hence, the crime of which he was accused was a felony, and such being its nature, section 13-904, Oregon Code 1930, required his personal appearance at the trial. The purpose of section 13-1602 is to carry into effect the guaranty embodied in Article I, section 10, Oregon Constitution, that "justice shall be administered * * * without delay * * *." *State v. Lee,* 110 Or. 682 (224 P. 627); *State v. Putney,* 110 Or. 634 (224 P. 279). From *State v. Lee,* supra, we quote:

"A 'speedy trial' is one conducted according to fixed rules, regulations and proceedings of law, free from vexatious, capricious and oppressive delays created by the ministers of justice."

Delays, due to the defendant's fault, as, for instance, his absence from the state in order to escape trial, afford no basis for dismissal of the charge: 8 R. C. L., Criminal Law, p. 74, sec. 28; *Hart v. United States,* 183 Fed. 368. It is apparent that the reason the defendant was not tried at the term of court immediately following the return of the indictment against him was due to no fault of the state, but because of the defendant's multiple crimes, and that the failure of the state to bring him to trial after his release from the Sacramento county jail was due to his absence from the state, apparently for the purpose of avoiding

prosecution. We find no merit revealed by this contention.

■■ In support of the fourth and fifth contentions, the defendant argues that when the governor of this state honored the extradition request presented by the governor of California our state chose not to prosecute him and waived its right to do so. In support of this contention he cites *People v. Klinger,* 319 Ill. 275 (149 N. E. 799, 42 A. L. R. 581) ; Opinion of the Justices, 201 Mass. 609 (89 N. E. 174, 24 L. R. A. (N. S.) 799) ; *Ex parte McDaniel,* 76 Tex. Crim. 184 (173 S. W. 1018, Ann. Cas. 1917B, 335) ; *Fulton v. State,* 178 Ark. 841 (12 S. W. (2d) 777). In the first of these cases a charge was pending against the defendant in the state of Wisconsin when he was surrendered by that state to an extradition agent of Illinois for return to Illinois and prosecution therein upon an Illinois charge. Having been convicted in Illinois, he contended, upon appeal, that when Wisconsin surrendered him before his trial in that state he was thereby deprived of a speedy trial in Wisconsin upon that state's charge against him. The Illinois court held that whether this contention possessed merit or not it could have no effect upon the regularity of his conviction in the Illinois court upon the Illinois charge. In the second of the above-cited decisions, the justices advised the governor of Massachusetts that he was without power to honor the requisition of the executive of New York for the surrender of a Massachusetts convict unless he exercised his executive power and granted a pardon. In both decisions the courts stated that when a state honors the requisition of another state by surrendering a fugitive against whom a charge is pending in the asylum state the latter state waives its right to punish the

accused. In the Texas case two indictments were pending against the defendant when the Texas governor executed an extradition warrant for his surrender to the state of New Mexico. Upon issues arising upon an application for a writ of habeas corpus the Texas court held that the prisoner should not be extradited until disposition had been made of the Texas indictments. In the Wisconsin case the court held that the mere fact that the accused was a convict serving a sentence in the Wisconsin penitentiary did not deny him the right to a speedy trial upon a pending indictment. We find nothing in these decisions affording material help in the solution of the problem before us. It will be recalled that when our defendant was surrendered to the extradition agent of California no indictment had been returned against him. An information had been filed and the district court had entered an order holding him to answer to the grand jury. The pendency of proceedings before the grand jury does not subject the defendant to jeopardy: Wharton's Criminal Law (12th Ed.) p. 395 and p. 397. The authorities are collected in 16 C. J., Criminal Law, p. 237, and see *Ex parte Tice*, 32 Or. 179 (49 P. 1038). Hence, had the district attorney dismissed the proceedings pending before the grand jury at the time the governor executed the extradition warrant, or had the grand jury returned a not true bill the state could, nevertheless, have presented the same charge again. This circumstance persuades us that the governor's action should not be deemed condonation of this state's charge against the defendant, but an exercise of comity between the two states for the purpose of facilitating the administration of the criminal laws. Such being our belief, we are of the opinion that the execution by the governor of

this state of the extradition warrant did not bar the defendant's prosecution. Being of the above opinion, we conclude that the first assignment of error possesses no merit.

In the second assignment of error the defendant criticizes the indictment as not sufficiently definite and certain to comply with sections 13-703, 13-706 and 13-714, Oregon Code 1930, and contends that, therefore, his demurrer should have been sustained. In support of this contention, he argues that the indictment fails to disclose clearly whether the defendant is accused of selling stock owned by the corporation or by himself. He concedes, however, that "the indictment accuses the appellant under section 25-1302, Oregon Code 1930, of selling and offering for sale 40 shares of the capital stock of the Pacific Phosphate & Chemical Co. * * *. The indictment further states that the stock was sold in the course of repeated and continuing transactions of a similar nature". If the stock was owned by the corporation, the provisions of the statute applicable to a broker would govern the controversy, whereas if the stock was owned by the defendant as an investment, the provisions of section 25-1304 would then be applicable. Section 25-1304 provides:

"The provisions of this act relating to the qualifying of securities for sale in this state shall not apply to * * * any sale of such security previously held by the vendor thereof as and for an investment by any person, or any sale, transfer or negotiation thereof by by the bona fide owner thereof * * * where such sale, negotiation or transfer is not in the course of repeated or continuing transactions of a similar nature."

The indictment is too lengthy for complete quotation but the portion which we deem material to a con-

sideration of this assignment of error, apart from those portions to which reference has already been made, is the following:

"There being then and there, and having been theretofore continuously preceding and inclusive the said 22d day of October, 1931, by and on the part of said Allan Swain an invitation to and solicitation of the public to make purchases of the capital stock of said corporation and the said offering for sale and sale of said capital stock to the said Ross Richardson then and there being and occurring in the course of continued and repeated transactions of a similar nature, by and on the part of the said Allan Swain in marketing said capital stock of the corporation * * *"

This language, together with the entire tenor of the indictment, negatived the exception applicable to an owner who makes sale of his stock "not in the course of repeated or continuing transactions of a similar nature". In the presence of this express negation we fail to perceive any necessity for an averment disclosing ownership of the stock. If the defendant repeatedly and continuously sold the stock of this company without a permit he was guilty of the crime charged in the indictment, whether he or the company owned the stock. But if an averment naming the owner was necessary, we believe that it is present in the indictment. No intelligent person can read the indictment without gleaning from it the fact that it attributes ownership of the stock to the defendant. The averment is by way of recital rather than by direct charge, but that irregularity did not render the indictment subject to demurrer. The circuit court did not err when it overruled the demurrer.

 In his third assignment of error the defendant contends that the court erred when it received evi-

dence of the transaction which occurred between him and Karl Nelson. He argues that the evidence shows that this sale was made in the state of Washington and that, therefore, all of the evidence concerning it was inadmissible. In the preceding review of the evidence we related all of the testimony descriptive of this transaction. The state, in order to prove its charge, was required to show that the defendant made sales, negotiations or transfers of his stock "in the course of repeated or continuing transactions of a similar nature". Although the stock certificate was delivered to Nelson in the state of Washington, the advertisements to which he responded were published in newspapers printed in this state; the conferences between himself and the defendant preceding the sale likewise occurred in this state; and the contract governing the sale was drafted and signed by both parties in Oregon. It seems reasonably clear that the parties did not contemplate that delivery of the stock certificates should occur in the state of Washington and that that incident occurred there without design. Section 25-1304 in defining the circumstances under which an owner may dispose of stock held by himself as an investment uses not only the word "sale" but also the words "negotiation" and "transfer". These three words occur in this section of our laws in the following manner: "Where such sale, negotiation or transfer is not in the course * * *." Section 25-1301, Oregon Code 1930, in defining some of the words which occur in our Blue Sky Law, provides: "The words 'sale' or 'sell' shall mean and include every disposition or attempt to dispose, or the solicitation of the purchase by others * * *." Section 64-806, being a part of our enactment of the Uniform Sales Act, defines the word "sale" thus: "Includes a bargain and sale as well as a sale and

delivery." To employ the meaning of the word "sale" ascribed to it by the defendant would convert our state into a safe place of retreat where unscrupulous dealers in securities could ply their vocation provided they did not make delivery of the stock in this state. It seems evident that the legislature by giving to the word "sale" the meaning assigned to it by section 25-1301 intended to prohibit dealers and brokers, not only from making deliveries in our state but also from conducting bargainings in the state. This is especially evident when we bear in mind the fact that the statute employs not only the word "sale" but also the two other words "negotiation" and "transfer". In holding this evidence admissible the circuit judge limited its consideration by the jury "to show that the defendant was actually engaged in the sale of the stock and is accepted only for the purpose of showing he was engaged in the sale of this stock and to show that he made other sales". No error is revealed by this assignment.

■ The fourth assignment of error submits that the trial judge erred when he instructed the jury:

"You are instructed that selling stock, and offering for sale of stock are not two separate crimes, but one crime, and either a sale or an offer for sale may be evidence of the commission of that crime, and evidence of repeated and continuing transactions of a similar nature in the commission thereof. * * * Insofar as this case is concerned a sale means every disposition, or attempt to dispose of, or by solicitation of the purchase by others, made by an agent, circular, letter, advertisement or otherwise, of a security or interest in a security for value."

The instructions also informed the jury that before they could return a verdict of guilty it was necessary

that they should find that the defendant was engaged "in the business of selling and disposing of such stock of such corporation named in the indictment. * * * The indictment alleges that this sale to Ross Richardson was not an isolated sale, but was one of continuing and repeated sales of a similar nature. That is necessary to be established * * *. The purpose and the only purpose for which these others could be entertained by you, and the purpose for which they were offered, was to show that the charge in the indictment was one of other repeated and continuing sales or offers for sale of a similar nature, and I further instruct you, members of the jury, that if you find that the defendant sold that stock to Ross Richardson in the course of repeated and continuing transactions of a similar nature by and on the part of said defendant in marketing the stock * * * then the defendant is a dealer within the meaning of the statute. * * * Now the crux of this case is whether the defendant Swain was engaged in selling the stock of the Pacific Phosphate & Chemical Company in such manner as to constitute a dealing in said stock. * * *"

The defendant contends that the portion of the above instructions to which he took exception, when applied generally, would authorize a judgment of guilty against an owner of stock who, finding it necessary to dispose of it, made three or four offers to friends before he found a purchaser. He argues, of course, that the owner is entitled to make at least one sale. We understand these instructions to mean that in determining whether the sales made by this defendant to Richardson, Allen and Nelson were sales made in the course of repeated and continuing transactions of a similar nature the jury was entitled to consider

the defendant's entire course of conduct; that is, his relationship with the firm of business brokers whom he hired to find prospects, the advertisements in the daily press, the solicitation to purchase which he made to Passmore and any other evidence showing the manner in which he offered his stock for sale. We find no error in the instructions.

In his fifth assignment of error the defendant contends that the circuit court erred in not directing the jury to return a verdict of not guilty. He contends that the evidence reveals only one sale in the state of Oregon, and that the words "continued and repeated transactions" occurring in section 25-1304 are indefinite and uncertain in meaning. From the review of the evidence which we have set forth previously, it is evident that we believe that not only the sale to Richardson but also the one to Allen occurred in this state, and that within the meaning of the word "sale" as employed in the act the defendant's transaction with Nelson was also a sale occurring in this state. Before determining whether the attacked words are indefinite in meaning, let us consider the manner in which the defendant proceeded to dispose of his stock. According to his testimony, he owned 350 shares of this stock. He did not, however, endeavor to sell it as a unit, but devised a plan to market it in small blocks. Pursuant to his scheme he employed a firm of business brokers who ran blind advertisements in the daily press to find prospects for him. At least four prospects were found and were introduced to the defendant by the brokers. Three of them purchased small blocks of stock and the fourth was also solicited to buy. All of the sales were made to individuals who, in their efforts to gain employment, made investments

in the business of their supposed employer. All sales were accompanied with an undertaking signed by the defendant to purchase back the stock at any time the buyer was dissatisfied. The latter feature is at strange variance with a bona fide attempt to dispose of stock. It seems clear that here we have a situation where the criticized words fit precisely the case. In *State v. Gerritson*, 124 Or. 525 (265 P. 422), a similar contention was considered that the above-quoted language was indefinite. We there rejected this contention as lacking merit. We do so again. We are of the opinion that the defendant's conviction rests upon evidence fully supporting it, and that the attacked language is not subject to criticism.

Having disposed of all of the assignments of error adverse to the defendant, it follows that the judgment of the circuit court must be affirmed.

RAND, C. J., and BELT and KELLY, JJ., concur.

-------

Petition for rehearing denied May 22, 1934

ON PETITION FOR REHEARING

(32 P. (2d) 773)

■ ROSSMAN, J. In his petition for a rehearing and the brief accompanying it, the defendant contends that the evidence fails to support our statement (concerning the sale of stock to Karl Nelson) that "the contract governing the sale was drafted and signed by both parties in Oregon". Not desiring to sponsor a decision based upon an erroneous conception of the facts, we have again examined the transcript of evidence and shall now endeavor to show that our above-quoted statement is supported by competent, substantial tes-

timony. It will be recalled that a series of advertisements appeared in Portland newspapers under the caption of Business Opportunities which offered employment to those who applied at 401 Dekum building, on condition that they make financial investments with the prospective employer; that Karl Nelson applied at the designated address; that he purchased twenty shares of stock in the corporation described in our previous decision; and that he was given employment. The defendant's brief states: "The record shows that a contract was drawn in Oregon." Thus, one portion of our quoted statement is given support. He argues, however, that the evidence fails to show that the contract thus drafted concerned the sale of stock. Since the trial court, upon the defendant's objection, excluded the challenged contract from the record, its language is not before us, but testimony given by Nelson in which he related the incidents which occurred upon his first visit at 401 Dekum building is as follows:

"A. Well, what took place was we began to talk about the job, and then they named the job they thought I would be fitted for, and they said they would get in touch with the manager of this corporation, and they telephoned—they telephoned to Mr. Swain and Mr. Swain came there in just a few minutes.

"Q. Did you make any contract with this defendant? A. Yes. He had a contract made out before—a stock contract, we had made out, I believe.

"Q. Did you execute a contract with him? A. Yes, sir.

"Q. And where did you make this contract out? Where? A. At Portland.

"Q. With this defendant? A. Yes, sir.

"Q. At that time did you have any conversation with this defendant? Did you discuss with him anything about the stock of the Pacific Phosphate & Chemical Company?"

No answer was made to this question because a colloquy occurred between court and counsel, at the conclusion of which the following question was asked: "Did you have any conversation with this man with reference to purchasing any stock in this Pacific Phosphate & Chemical Company?" To it the witness replied: "Yes, sir." Immediately after this contract, which, it will be observed, Nelson described as "a stock contract", was signed, he was given employment and still later the stock certificate was delivered to him. Neither the defendant, nor any other witness, contradicted this testimony nor gave any explanation at variance with it. Other portions of the record indicate that Nelson's experience with the defendant was substantially similar to that of the other witnesses who gave a more extensive explanation of the transaction; that is, that he was compelled to purchase stock in order to secure employment and that the transaction occurred in Oregon.

The petition for a rehearing is denied.

RAND, C. J., and BELT, J., concur.

KELLY, J., did not participate in this decision.