Filed:  November 10, 2011

IN THE SUPREME COURT OF THE STATE OF OREGON

STATE OF OREGON,

Respondent on Review,

v.

VLADIMIR VLADIMIROVICH GLUSHKO,

Petitioner on Review.

(CC 209903037; CA A142224; SC S059136 (Control))
_____

STATE OF OREGON,

Respondent on Review,

v.

HAROLD VERNON LITTLE,

Petitioner on Review.

(CC 981756M, 990259M; CA A141888, A141889; SC S059137)
(Consolidated for argument and opinion)

En Banc

On review from the Court of Appeals.*

Argued and submitted September 20, 2011.

Zachary L. Mazer, Deputy Public Defender, Salem, argued the cause and filed the brief for petitioners on review.  With him on the brief was Peter Gartlan, Chief Defender, Office of Public Defense Services.

Rolf C. Moan, Assistant Attorney General, Salem, argued the cause and filed the brief for respondent on review.  With him on the brief were John R. Kroger, Attorney General, and Mary H. Williams, Solicitor General.

LANDAU, J.

The decisions of the Court of Appeals and the judgments of the circuit courts are affirmed.

*Appeal from Lane County Circuit Court, Cynthia D. Carlson, Judge. 240 Or App 464, 248 P3d 451 (2011).

Appeal from Josephine County Circuit Court, Pat Wolke, Judge. 240 Or App 464, 248 P3d 451 (2011).

LANDAU, J.

ORS 135.747 provides that,

"[i]f a defendant charged with a crime, whose trial has not been postponed upon the application of the defendant or by the consent of the defendant, is not brought to trial within a reasonable period of time, the court shall order the accusatory instrument to be dismissed."

The issue in these two cases is whether defendants' failures to appear at scheduled hearings amount to "consent" to a delay in proceedings within the meaning of that statute, and, if not, whether any delays caused by such failures to appear were nevertheless reasonable. We conclude that a mere failure to appear does not constitute consent within the meaning of ORS 135.747, but that, under the circumstances of these cases, the delays were reasonable.

I.      BACKGROUND

The relevant facts of each of the two cases are few and undisputed.

A.      *State v. Glushko*

On February 22, 1999, the state charged defendant Glushko by information with one count of attempt to elude, one count of reckless driving, and one count of driving under the influence of intoxicants (DUII). A grand jury indicted defendant with those charges on March 5, 1999. A few weeks later, on March 26, 1999, defendant was arraigned and entered a "not guilty" plea. On April 30, 1999, defendant entered into a diversion agreement as to the DUII charge. As part of his diversion agreement, defendant signed an agreement and waiver form, in which he acknowledged that

"[t]he court will terminate this diversion agreement if the court finds that you have violated the terms of the diversion agreement or that you

1

were not eligible for diversion to begin with. The court will make this determination at a hearing where you can 'show cause' why you should not be removed from the diversion program. * * * **Notice of such hearings will be sent to you by regular mail.** If you fail to appear in court as directed by the mailed notice, the court will terminate the diversion agreement and prosecution of the offense will be resumed."

(Boldface in original.) As part of the diversion agreement, defendant was also required to keep the court informed of his mailing address, which he originally disclosed as a residence in Citrus Heights, California.

On June 11, 1999, defendant changed his pleas as to the first two counts, attempt to elude and reckless driving, to guilty. Five days later, the trial court sentenced defendant to 18 months' probation.

On June 25, 1999, the trial court received notice that defendant failed to attend a victim impact panel, which was a requirement of his diversion program. The trial court ordered defendant to appear on July 12 to determine whether his diversion program should be revoked. Defendant attended that hearing, and the trial court decided to allow defendant to continue his diversion program on the condition that defendant attend a victim impact panel in California within 60 days.

On May 12, 2000, the trial court, having received information that defendant had failed to complete another required treatment program, again ordered defendant to appear on June 2, 2000, to show cause why his diversion program should not be revoked. The order stated that "[i]f defendant fails to appear as ordered, a bench warrant shall be issued for his arrest." Defendant failed to appear at that hearing. Shortly after that, on June 6, 2000, the trial court terminated defendant's diversion, ordered that

2

the prosecution should resume, and issued a warrant for defendant's arrest.

Eight-and-a-half years later, on November 5, 2008, an officer executed the arrest warrant. An initial hearing was held of November 14, 2008, during which the trial court appointed an attorney for defendant. On November 25, 2008, defendant moved to dismiss the DUII charge for failure to comply with the statutory speedy trial requirement, ORS 135.747. The trial court denied the motion. Ultimately, defendant was found guilty of DUII after a jury trial on April 1, 2009.

B.    *State v. Little*

On December 18, 1998, defendant Little was cited for driving under the influence of intoxicants (DUII) and ordered to appear on January 5, 1999, for arraignment. Defendant did so, and at that time, the trial court entered a release order, which required defendant to appear the following week on January 12. That hearing was rescheduled for January 19. Defendant did not appear, and the trial court issued an arrest warrant.

On February 19, 1999, defendant was, again, arrested for DUII. The trial court entered a conditional release agreement and order, requiring defendant to appear on February 23. Defendant signed the agreement, acknowledging that he had read the agreement and understood the terms contained in the agreement. As relevant to our analysis, the agreement provided that

> "[f]or any failure to appear as required before a judge or other judicial officer, a warrant for arrest may be issued and [defendant] shall be subject to prosecution as per the following penalties: forfeiture of security as per security subsection; **Felony charge:** fine not to exceed $100,000 and five (5) years imprisonment; **Misdemeanor charge:** fine not to exceed

3

$2,500 and one (1) year imprisonment."
(Boldface in original.) Defendant also wrote on the form that his current address was on Hilltop Lane in Josephine County. That address, however, was the address of a friend who defendant was visiting; defendant actually resided in California.

Defendant failed to appear at the hearing on February 23, and the trial court issued an arrest warrant. In 2002, defendant moved to Milwaukie, Oregon. Since then, defendant has maintained a residence in Oregon, maintained employment with several businesses in the state, and applied for and received an Oregon identification card and, a few years later, an Oregon driver's license. In 2008, defendant applied for employment that required an FBI background check. The potential employer notified defendant that there were two pending charges and an outstanding warrant for defendant's arrest in Josephine County.

On August 8, 2008, defendant called the Josephine County clerk's office and scheduled an appearance date to resolve the outstanding warrant. On August 13, defendant appeared before the trial court. At that time, defendant received court-appointed counsel, and was released on condition that he attend all future court hearings.

On March 3, 2009, defendant moved to dismiss all charges, asserting his statutory right to a speedy trial. After a hearing on March 17, the trial court denied the motion. The following day, defendant entered a conditional guilty plea, reserving the right to appeal the denial of his motion to dismiss.

C.    *Proceedings Before the Court of Appeals*

Both defendants appealed, arguing that the trial courts erred in denying

4

their motions to dismiss. Defendants noted that, under ORS 135.747,

> "[i]f a defendant charged with a crime, whose trial has not been postponed upon the application of the defendant or by the consent of the defendant, is not brought to trial within a reasonable period of time, the court shall order the accusatory instrument to be dismissed."

Both argued that whether or not they were deprived of their statutory right to a speedy trial "hinge[d]" on the delay between the date the trial court issued the arrest warrant and the date the warrant was executed. In defendant Glushko's case, the delay amounted to 101 months (approximately eight and a half years). In defendant Little's case, the delay was 114 months (approximately nine and a half years).

Defendant Glushko argued that

> "a defendant's express consent to delay is required before that delay is counted against him, and a defendant's failure to appear does not constitute express consent to delay. Thus, the * * * delay in this case was not attributable to defendant * * * [and] warrants dismissal, because no evidence in the record indicates that the delay was reasonable."

Defendant Little argued likewise that he did not "expressly consent to any of that delay, and the state must justify the delay to render it reasonable. As the state failed to justify the delay in this case, the trial court erred by denying defendant's motion[] to dismiss."

The Court of Appeals affirmed both cases without an opinion. *State v. Glushko*, 240 Or App 464, 248 P3d 451 (2011), *State v. Little*, 240 Or App 464, 248 P3d 451 (2011). Both defendants petitioned this court for review. We accepted review and consolidated the cases to consider whether the failure to appear at a hearing was "consent" to delay, as used in ORS 135.747 and, if it was not, whether the delay was reasonable nonetheless.

5

D. *Parties' Arguments Before This Court*

On review, defendants argue that failure to appear at a hearing is neither "an active request for delay in trial" nor "an open, clear, and unambiguous agreement to delay." In order to qualify as "consent," defendants contend, one must express "agreement to *a request for delay by someone else*." (Emphasis added.) Thus, in order for a defendant to "consent" to delay, the state must first request the defendant's consent, and then the defendant must provide "express consent" (*i.e.*, consent which is "expressed openly, clearly, and unambiguously").

In any event, defendants assert, the delays in bringing their cases to trial -- 101 months in defendant Glushko's case and 114 months in defendant Little's -- were unreasonable because, in both cases, the state easily could have executed the warrants at an earlier time. Defendant Glushko notes that, during the six months following his failure to appear, he was still on probation for other charges. Arguably, he asserts, the state could have arrested him by notifying his probation officer of his failure to appear. Defendant Little similarly suggests that the state could have contacted him at two different points in time: (1) the state could have called his friend's phone number that he listed on his release agreement, obtained his California address, and notified him of the outstanding arrest warrant; or (2) the state could have arrested him once he moved to Oregon and provided his current address to the Department of Motor Vehicles.

The state responds that, in both cases, defendants' failure to appear was consent to any resulting delay. The state asserts that conduct that "implie[s] a willingness to submit to a particular course of action" is consent and that, in this case, "defendants'

6

conduct entitled the trial courts to conclude that they consented to an indefinitely delayed trial."  Additionally, the state argues that, even if defendants' failures to appear were not consent to the resulting delays, their conduct in not attending a hearing for which they were legally required to attend renders any delay caused by their failures to appear reasonable.

II. ANALYSIS

As this court explained in *State v. Davids*, 339 Or 96, 100-01, 116 P3d 894 (2005), review of a trial court's decision on a motion to dismiss brought under ORS 135.747 entails a two-step analysis.  First, we must determine the relevant amount of delay by subtracting from the total delay any periods of delay that defendant requested or consented to.  Second, we then determine whether that delay is reasonable.  In this case, the parties' arguments implicate both of those analytical steps, namely, whether a failure to appear at a hearing that a defendant is required to attend amounts to "consent" to a postponement within the meaning of ORS 135.747; and second, if not, whether delay occasioned by such a failure to appear renders any delay that results reasonable within the meaning of that statute.

A.    *Consent*

We necessarily begin with the issue of consent, because it determines the amount of delay that is then subject to the reasonableness analysis that the statute requires.  The issue is one of statutory interpretation.  As such, we strive to ascertain the meaning of the statute most likely intended by the legislature that adopted it, by examining the statute's text, in context, and where appropriate, relevant legislative history

7

and canons of statutory construction. *State v. Gaines*, 346 Or 160, 171-73, 206 P3d 1042 (2009).

What is now ORS 135.747 had its genesis in the territorial code, which provided:

> "If a defendant indicted for a public offen[s]e, whose trial has not been postponed upon his application, be not brought to trial at the next term of the court in which the indictment is triable, after it is found, the court shall order the indictment to be dismissed, unless good cause to the contrary be shown."

The Laws of the Territory of Oregon, ch XXXVI, § 29 (1854). The wording of the provision was most likely based on the nearly identical Iowa speedy trial statute, Iowa Code of 1851, ch 200, § 3249. *See* Charles H. Carey, *General History of Oregon* 475-77 (3rd ed 1971).

As originally framed, Oregon's territorial speedy trial statute required a case to be brought to trial at the next term of court -- at the time, trial courts did not sit continuously, but in limited terms -- subject to two exceptions: first, if the failure to bring defendant to trial was caused by his "application" that the case be "postponed"; second, if the failure to bring the case to trial within the next term was occasioned by delays other than defendant's application for a postponement, but that were nevertheless justified by "good cause." The territorial speedy trial statute said nothing about a defendant's consent to delays in bringing a case to trial.

The matter of consent was first introduced to the statute in 1864, when the legislature adopted the Deady Code. As amended, the speedy trial statute provided, with the relevant new wording in italics:

8

"If a defendant, indicted for a crime, whose trial has not been postponed upon his application *or by his consent*, be not brought to trial at the next term of the court in which the indictment is triable, after it is found, the court must order the indictment to be dismissed, unless good cause to the contrary be shown."

General Laws of Oregon, Crim Code, ch XXXI, § 320, p 496 (Deady 1845-1864)

(emphasis added).

There is no direct evidence of what the legislature intended by its decision to insert the words "or by his consent" into the statute. The placement of the additional words in a phrase set off by commas -- "whose trial has not been postponed upon his application or by his consent" -- suggests that a defendant's consent relates to an application for postponement; that is, the wording suggests that the failure to hold a trial within the next term is occasioned either by a defendant's own application for a postponement or by defendant's consent to an application made by someone else, presumably, the state.

That suggestion is consistent with the meaning of the noun "consent" as it most likely would have been understood at the time. *Webster's* defined consent as

"Agreement of the mind to what is proposed or stated by another ; accord ; hence, a yielding of the mind or will to that which is proposed[.]

"We generally use this word in cases where power, rights and claims are concerned. We give consent, when we yield that which we have a right to withhold[.] * * * Consent often amounts to permission."

Noah Webster, 1 *An American Dictionary of the English Language* (1828) (reprint 1970) (emphasis in original). "Consent" is thus generally part of a bilateral sequence of events in which there is a response "to what is proposed or stated by another." *Id. Bouvier's*

9

dictionary similarly defined "consent" as "[a]n agreement to something proposed, and differs from assent." John Bouvier, 1 *A Law Dictionary Adapted to the Constitution and Laws of the United States of America* 277 (9th ed 1860). Again, the definition refers to consent as a response to a proposal. In the context of the original version of ORS 135.747, the only relevant proposal to which a defendant would consent would be an application for a postponement filed by the state.

That reading of the statute is consistent with other, related provisions. Also part of the original Deady Code were statutes detailing the procedure for obtaining a postponement of trial. What is now ORS 136.070 provided:

"When an indictment is at issue upon a question of fact, and before the same is called for trial, the court may, upon sufficient cause shown by the affidavit of the defendant, or the statement of the district attorney, direct the trial to be postponed to another day in the same term or to another term[.]"

General Laws of Oregon, Crim Code, ch XIV, § 145, p 465 (Deady 1845-1864).

Correspondingly, what is now ORS 136.080 provided:

"When an application is made for the postponement of a trial, the court may, in its discretion and in the furtherance of justice, require as a condition precedent to granting the same, that the party applying therefor consent that the deposition of a witness or witnesses may be taken and read on the trial of the case, and unless such consent be given, may refuse to allow such postponement for any cause."

General Laws of Oregon, Crim Code, ch XIV, § 146, p 465 (Deady 1845-1864).

Consistently with what we have suggested is most likely the intended meaning of ORS 135.747, those two statutes contemplate either the state or the defendant making "an application" for the proceedings to be "postponed" to "another term." In that context, it

10

becomes likely that, when the legislature referred to a defendant's "consent" in ORS 135.747, it meant consent to an application for postponement filed by the state.

That reading of ORS 135.747 appears to be borne out by the case law construing it. From early on, this court's cases refer to "consent" in reference to a defendant's express agreement to a state's application for a postponement, while other considerations such as a defendant's failure to appear are taken into account in determining whether there was "good cause" for the failure to bring a case to trial in the time required. In treating failure to appear in that fashion, the Oregon cases aligned with case law construing the statutes on which the Oregon law was based. *See, e.g.*, *The State of Iowa v. Arthur*, 21 Iowa 322, 324 (1866) (holding that the court had "no doubt" that "good cause" was shown to justify delays that resulted from the defendant's failure to appear).

In *State v. Moss*, 92 Or 449, 460-61, 181 P 347 (1919), for example, the court drew a distinction between delays occasioned "with the express consent and approval of the defendant" and those caused when defendant "absented himself from court and stayed away." Similarly, in *State v. Swain*, 147 Or 207, 211, 31 P2d 745, *on reh'g*, 32 P2d 773 (1934), the defendant was charged by information with the unlawful sale of securities. He was shortly after extradited to California, where he was charged and convicted of other offenses. *Id.* After completing his sentence in California, he simply remained there for over a year before returning to Oregon, where he was promptly arrested and tried on the pending charge. He moved to dismiss the charges on statutory speedy trial grounds. The trial court found that the defendant's failure to return to the

11

state apparently for the purpose of avoiding prosecution amounted to good cause for the delay in bringing the case to trial. *Id.* at 213-14. This court affirmed, explaining that "[d]elays, due to the defendant's fault, as, for instance, his absence from the state in order to escape trial, afford no basis for dismissal of the charge" under the speedy trial statute. *Id.* at 214. The court did not mention the subject of consent.

In contrast, in *State v. Chadwick*, 150 Or 645, 650, 47 P2d 232 (1935), the court directly addressed the meaning of the reference to "consent" in the speedy trial statute, and concluded that it referred to express agreement to a proposed postponement. In that case, the defendant was indicted but not tried until four terms of court had passed. *Id.* at 647. Two terms passed because of the defendant's own motions for continuances. *Id.* The other two terms, however, passed without a motion "for continuance nor did the defendant expressly consent to a continuance at that time." *Id.* The trial court held that, during those two terms, the defendant had given "tacit consent" to the delays because he had not objected to them. *Id.* at 650. This court rejected the trial court's reasoning, explaining that, "where the statute refers to the consent of defendant, it means his express consent." *Id.* To similar effect is *State of Oregon v. Kuhnhausen*, 201 Or 478, 494, 266 P2d 698, *on reh'g*, 272 P2d 225 (1954), in which this court explained that, "[w]hen 'consent' of a defendant to a continuance for trial is claimed, an express consent, as distinguished from an implied consent, must be shown."

By the mid-twentieth century, trial courts no longer sat in limited terms and, instead, operated continuously. In response to that development in court administration, in 1959, the legislature amended the speedy trial statute to eliminate the

12

requirement that a defendant be brought to trial "at the next term of the court" unless "good cause" is shown and substituted the requirement that trial occur "within a reasonable period of time." Nothing in the text or the legislative history of those amendments suggests that the legislature intended to alter the substance of the speedy trial guarantee. *See generally State v. Johnson*, 339 Or 69, 80-81 & n 7, 116 P3d 879 (2005) ("[T]he legislature's clear overall purpose in enacting the [1959] amendments was to remove references to term-based scheduling. There is no hint anywhere in the statute that the legislature had any other purpose in mind.").

Consistently with that reading of the 1959 amendments, this court's more recent cases have continued to interpret the reference to a defendant's "consent" under ORS 135.747 as the pre-amendment cases had done; that is, the court has continued to conclude that the statute requires express consent to a request for a postponement. *State v. Adams*, 339 Or 104, 116 P3d 898 (2005), is exemplary. In that case, the state argued that the defendant had consented to the state's request for a five-month postponement by not objecting to the state's request. *Id.* at 109. Indeed, in *Adams*, the state advanced precisely the same argument that it puts forth in this case, namely, that "a defendant who fails to appear, fails to object to delay, and objects to acceleration of his trial date, implicitly consents to delay" under ORS 135.747. Brief on the Merits of Petitioner on Review at 23, *Adams*, 339 Or 104 (S51598). The court, citing *Chadwick*, rejected that argument, explaining:

> "Before this court, the state continues to press its theory that, for purposes of ORS 135.747, 'consent' includes a mere failure to object. This court's cases are, however, contrary to that position. *See, e.g., State v.*

13

*Chadwic*k, 150 Or 645, 650, 47 P2d 232 (1935) ("where the statute refers to the consent of defendant, it means his express consent").

"* * * In cases like the present one, a lack of objection is just (and only) that: a lack of objection. It conveys no message that the defendant either joins in the motion or waives any rights that he has that are affected by the motion. * * * [A] recital by the state that defense counsel has 'no objection' is insufficient to place a defendant's express consent on the record, as *Chadwick* requires."

*Adams*, 339 Or at 109.

In this case, the state reprises its contention from *Adams* that "consent" to postponement under ORS 135.747 should not be limited to express consent in response to a request for postponement and, instead, should be understood to embrace implicit consent to delays on the basis of a defendant's conduct, such as a failure to appear. In support, the state marshals two arguments not advanced in *Adams*, one based on what it suggests is the ordinary meaning of the statute's terms and the other based on this court's prior cases.

The state's textual argument is that the ordinary meaning of the term "consent," as it would have been understood in 1864, embraces implied consent based on a person's conduct. The state relies on Samuel Johnson's 1765 dictionary, which defines the verb "consent" to mean, among other things, "to allow." Samuel Johnson, 1 *A Dictionary of the English Language* (3d ed 1765). The state then notes that Johnson defines the verb "allow" to mean, among other things, "to permit." *Id.* Because one may "permit" either expressly or implicitly, the state reasons, it follows that consent under the speedy trial statute may be inferred by conduct such as failing to appear at a hearing.

We are not persuaded. Assuming for the sake of argument the relevance of

14

a mid-eighteenth century dictionary of British English, the fact is that the state ignores the definitions of the *noun* "consent" that is used in ORS 135.747 and instead focuses on definitions of the *verb* term of the word "consent." As we explained in *State v. Bray*, 342 Or 711, 719 n 6, 160 P3d 983 (2007), when consulting dictionaries for the ordinary meanings of statutory terms, it is important to examine the definition of the part of speech actually used in the statute at issue. Moreover, the state is unduly selective in list of definitions. Johnson, for example, defined "consent" to mean not just "to allow," but also "to agree," which he then defined to mean, among other things, "to grant; to yield to," which -- necessarily entailing a proposition to which another grants or yields -- is more in keeping with the interpretation that this court has employed. Johnson, 1 *A Dictionary of the English Language*. But most important, statutes are not interpreted by culling dictionaries for favorable definitions. As we recently explained in *State v. Cloutier*, 351 Or 68, 96, ___ P3d ___ (2011), "[i]n construing statutes, we do not simply consult dictionaries and interpret words in a vacuum. Dictionaries, after all, do not tell us what words mean, only what words *can* mean, depending on their context and the particular manner in which they are used." (Emphasis in original.)

In the alternative, the state suggests that, at least by 1959, when the legislature amended ORS 135.747, "consent" would have been understood to embrace both express and implied acquiescence. In support of that contention, the state principally relies on the *Oxford English Dictionary*, the 1933 edition of which defined the term to refer to, among other things, "acquiescence in what another * * * desires." 2 *The Oxford English Dictionary* 851 (James A. H. Murray et al eds., 1933). The state then

15

notes that the same dictionary defines the term "acquiescence" to include "silent or passive assent to, or compliance with, * * * measures."  1 *The Oxford English Dictionary* at 85.

Again, the state's textual argument is not persuasive.  To begin with, the 1959 legislature's intentions are not controlling.  As we have noted, it was the 1864 legislature that introduced the phrasing at issue in this case, and the 1959 amendments did not alter that phrasing.  *Cf. Mastriano v. Board of Parole*, 342 Or 684, 693-96, 159 P3d 1151 (2007) (stating that, when amendments to a statute worked no change to wording at issue, legislative views about the portions not amended are not pertinent).  Indeed, as this court explained in *Johnson*, those 1959 amendments were intended only to eliminate references to term-based scheduling.  339 Or at 80-81.

Aside from that -- and, again, assuming the relevance of a dictionary of British usage as evidence of what the Oregon legislature most likely intended -- the fact is that there is more to the definitions than what the state quotes.  The state omits from its quotations of the definitions of "consent" and "acquiescence" important qualifiers, substituting ellipses in their place.  The definition of "consent" actually is "voluntary agreement to or acquiescence *in what another proposes* or desires; compliance, concurrence, permission."  2 *The Oxford English Dictionary* at 851 (emphasis added).  Similarly, the definition of "acquiescence" is "silent or passive assent to, or compliance with, *proposals* or measures."  1 *The Oxford English Dictionary* at 85 (emphasis added).  Thus, even assuming that "consent" could be understood to include implicit acquiescence, it refers to such acquiescence to something that someone else proposes or

16

desires. In the context of ORS 135.747, then, consent would refer to acquiescence in what another party -- the state -- has requested; that is, a postponement.

The state also claims support from three of this court's decisions: *State v. Crosby*, 217 Or 393, 342 P2d 831 (1959); *State v. Robinson*, 217 Or 612, 343 P2d 886 (1959); and *State v. Jackson*, 228 Or 371, 365 P2d 294 (1961). The state reads those decisions to embody the broad proposition that -- notwithstanding the holdings in *Chadwick*, *Kuhnhausen*, and *Adams* to the contrary -- "consent" under ORS 135.747 does not necessarily require *express* consent to a requested delay. To the contrary, the state contends, those later cases show that a defendant may implicitly consent to delays that necessarily result from his or her conduct, such as failing to appear at a scheduled hearing. As a result, the state concludes, *Chadwick*, *Kuhnhausen*, and *Adams* should be confined to their particular facts, if not overruled.

There is, we must acknowledge, wording in at least one of the three cases that is not entirely consistent with the definition of "consent" that this court adopted in *Chadwick* and later cases. Even so, none of the cases on which the state relies can fairly be read to stand for the broader proposition that it claims from them.

In *Crosby*, the defendant filed a demurrer, which the trial court then delayed 10 terms of court to decide. 217 Or at 395-96. When the trial court overruled the demurrer and set the case for trial, the defendant moved to dismiss under the speedy trial statute. The trial court denied the motion, and this court reversed. The court explained that, by filing the demurrer, "the defendant, in effect, consented to a postponement." *Id.* at 404. The court hastened to add that not all of the delay that

17

followed the filing of the motion could be attributed to the defendant and then concluded that, under the circumstances, 10 terms was unreasonable. *Id.* at 405.

The court's use of the term "consent" is not precisely consistent with what it had held in *Chadwick*, that is, express consent to a requested postponement. It is clear, however, that the court did not believe that it was retreating from its earlier holding in *Chadwick*. The court, in fact, mentioned *Chadwick* and discussed it. *Crosby*, 217 Or at 397-99. The court said nothing about "consent" under the speedy trial statute referring to a defendant's agreement to delays implicit in the defendant's conduct. It merely stated that, when a defendant *expressly asks* the court to rule on a motion that necessarily entails some delay, that express request is, "in effect," express consent to that delay. *Id.* at 404. What the court likely meant was that filing a motion that necessarily entails delay is, "in effect," a request for postponement for a reasonable period of time to rule on the motion. But, at all events, the decision cannot fairly be read to stand for the broad proposition that consent may embrace acquiescence to an open-ended postponement implied from a defendant's conduct.

*Robinson* also involved a defendant who filed a demurrer against the indictment, resulting in the trial's postponement until the following term of court. 217 Or at 620. The defendant argued that the indictment should have been dismissed on statutory speedy trial grounds. This court disagreed, noting that, by expressly asking the court to stop proceedings to consider and rule on his motion, "[t]he delay thus created falls within the term of [ORS 135.747] which is, 'has not been postponed upon his application or by his consent.'" *Id.* at 623-24. Thus, *Robinson* could be read to suggest

18

that, by requesting the court to rule on the demurrer, defendant, in effect, applied for a postponement for a reasonable period of time to rule on the motion. Or, it could be read to mean, as the court suggested in *Crosby*, that the filing of the demurrer amounted to express consent to such a delay. Either way, however, the decision cannot fairly be read to have retreated from *Chadwick* and announced in its place an interpretation of the speedy trial statute that recognized that consent to delays could be implied from his or her conduct.

*Jackson* did not involve the issue of consent at all. In that case, the defendant's repeated requests for new counsel resulted in significant delays in setting the case for trial. 228 Or at 378-81. When he moved to dismiss on statutory speedy trial grounds, the trial court denied the motion, and this court affirmed. *Id.* at 375-76. The court explained that the controlling question was whether the delay in bringing the defendant to trial was "reasonable" within the meaning of the speedy trial statute. *Id.* at 377. "[T]he question of reasonable time," the court stated, "cannot be determined without inquiring into the question whether there was good cause for delay." *Id.* In response to that question, the court said that the delay was substantially a product of the defendant's own repeated requests for the appointment of new counsel; that, the court concluded, amounted to good cause for the delays. *Id.* at 381. *Jackson* thus provides no support for the state's suggestion that a defendant's conduct may give rise to an inference that the defendant consented to any delay that was a product of that conduct. Under *Jackson*, such conduct is simply taken into account in determining whether there was good cause for the delay.

19

In asserting the contrary, the state characterizes *Jackson* as stating that whether the delay resulting from the defendant's conduct "was 'reasonable' was 'not the question.'"  What *Jackson* actually said, however, was that whether the delay that resulted from the defendant's requests "would be considered a reasonable time *under other circumstances than those which the record discloses* is not the question," which is an entirely different point.  228 Or at 378 (emphasis added).

In summary, based on the text, context, and historical origins of ORS 135.747, we hold that a defendant gives "consent" to a delay only when the defendant expressly agrees to a postponement requested by the state or the court.  Returning to the facts of this case, it is clear that the delays at issue were not a product of postponements that defendants requested or postponements that the state or the court requested and to which defendants agreed.  That conclusion, however, is not the end of the matter.  Even if, as in this case, defendants did not apply for or consent to the delays in question, dismissal is required only if the state fails to bring defendants to trial "within a reasonable period of time."  ORS 135.747.

B.     *Reasonableness of Delay*

We turn to the question whether the delays in bringing defendants to trial in the cases before us were reasonable within the meaning of ORS 135.747.  In *Johnson*, this court explained that whether a time period is "reasonable" under that statute requires an examination of "all the attendant circumstances" of the delay.  339 Or at 88.  In particular, "*the circumstances that cause the delay* generally will determine whether the delay (and thus, the overall time period for bringing the defendant to trial) is reasonable."

20

*Id.* (emphasis added). We review the question whether the delay in bringing a defendant to trial was "reasonable" within the meaning of ORS 135.747 as a matter of law. *Id.* at 87.

As our previous discussion of the case law makes clear, from very early on, this court has concluded that delays occasioned by a defendant's failure to appear constitute good cause for the delays. *See, e.g.*, *State v. Thompson*, 240 Or 468, 470, 402 P2d 243 (1965) (because the defendant "was continuously absent from the state," his argument that he was denied a speedy trial due to the resulting delay was "without merit"); *Swain*, 147 Or at 214-15 ("Delays, due to the defendant's fault, as, for instance, his absence from the state in order to escape trial, afford no basis for dismissal of the charge [under the speedy trial statute.]"); *Moss*, 92 Or at 460-61 (dismissal not required when the defendant "absented himself from court and stayed away for the remainder of the term").

In this case, there is no question but that both defendants caused the delays in bringing their cases to trial by their failures to appear. Both had notice that they were legally obligated to appear. Moreover, both were informed -- defendant Glushko in the order requiring personal appearance and defendant Little in his release agreement -- that failure to appear would result in a warrant for their arrest being issued. With knowledge of the legal requirement to appear and the consequences that would result from failure to appear, both defendants did not attend their respective hearings. As a result of their failures to appear, the state suspended the prosecutions, the court issued warrants for their arrest, and the cases were not tried until more than eight years later.

21

Defendants assert that, notwithstanding their failures to appear, the delays in their cases were unreasonable because the state could have made a greater effort to locate them and return them to custody. Specifically, defendant Glushko asserts that, because he was on probation for two other charges for at least six months after he failed to appear at the hearing, the state easily could have executed the warrant for his arrest, because he was still in the "constructive custody" of the state. Defendant Little, for his part, argues that the state could have tracked him down by using the contact information he provided on his release agreement or, a few years later, when he applied for and received an Oregon identification card.

The fact that the state may or may not have been able to take additional steps to track down defendants is not the point when, as in this case, defendants were entirely in control of the amount of delay that followed their failures to appear. *Cf. Johnson*, 339 Or at 88-89 (state-caused delay, such as resource deficiencies and trial court scheduling decisions, is relevant to reasonableness analysis under ORS 135.747). Both knew about their obligations to appear, as we have noted, and both knew that failing to do so would result in the issuance of warrants for their arrests. Both were well aware of the fact that their failures to appear delayed the prosecution of the cases against them. As this court explained in *Jackson*, a court is not required to dismiss a case when a defendant, "by his conduct bring[s] about the very delay in the prosecution of a criminal case which he afterwards claims to be a violation of his right to a speedy trial." 228 Or at 381.

In summary, we conclude that, although defendants did not consent to the

22

delays that occurred in each of their cases as a result of their failures to appear, the delays were nonetheless reasonable. The trial court therefore did not err in denying defendants' motions to dismiss on statutory speedy trial grounds.

The decisions of the Court of Appeals and the judgments of the circuit courts are affirmed.