Argued and submitted May 17, 2013, affirmed April 20, 2016

STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

JAMES BRONSON, JR.,
*Defendant-Appellant.*

Baker County Circuit Court
08947; A149117

372 P3d 560

Mike Kilpatrick argued the cause and filed the brief for appellant.

Janet A. Klapstein, Assistant Attorney General, and Stephanie L. Striffler, Assistant Attorney General, argued the cause for respondent. With them on the brief were

Ellen F. Rosenblum, Attorney General, and Anna M. Joyce, Solicitor General.

Before Duncan, Presiding Judge, and Flynn, Judge, and Schuman, Senior Judge.*

DUNCAN, P. J.

* Flynn, J., *vice* Haselton, S. J.

### DUNCAN, P. J.

Defendant, a member of the Nez Perce tribe, killed two bighorn sheep and, as a result, was charged with two misdemeanors (taking wildlife and possessing wildlife) with respect to each animal. His first trial ended when the judge declared a mistrial. On retrial, defendant filed a motion to dismiss on the ground that he was denied a speedy trial as required by *former* ORS 135.747 (2011), *repealed by* Or Laws 2013, ch 341, § 1.[1] The court denied that motion. Defendant also argued in a demurrer, a motion to dismiss, a motion for a judgment of acquittal, and proposed jury instructions, that, under the terms of an 1855 treaty between the federal government and the Nez Perce, he was entitled to "take" (that is, kill) the sheep despite any state laws or regulations to the contrary. The trial court rejected that argument as well. Defendant was subsequently convicted on all counts. On appeal, he assigns error to the rulings regarding speedy trial and treaty rights. We reject defendant's arguments regarding his speedy trial motion in light of our decision in *State v. Garner*, 253 Or App 64, 289 P3d 351 (2012), *rev den*, 353 Or 280 (2013), which held that a defendant is "brought to trial" for purposes of *former* ORS 135.747 when trial is commenced, even if that trial ultimately ends in a mistrial. With regard to treaty rights, we likewise conclude that defendant has not demonstrated reversible error— particularly, in light of (1) defendant's concession on appeal that hunting rights under the treaty are limited to areas that the Nez Perce historically used for hunting, and (2) the trial court's express factual finding that the area in which the sheep were killed was *not* actually used historically by the Nez Perce for hunting.

## I. BACKGROUND

In the trial court, this case was fraught with procedural complications and factual disputes. Defendant's

---

[1] *Former* ORS 135.747 (2011) provided that a case must be dismissed "[i]f a defendant charged with a crime, whose trial has not been postponed upon the application of the defendant or by the consent of the defendant, is not brought to trial within a reasonable period of time[.]" Although that statute has been repealed, we have held that statutory speedy trial claims that arose prior to the repeal should be analyzed according to the speedy trial statute in effect at the time the trial court considered the motion. *State v. Straughan (A147718)*, 263 Or App 225, 235, 327 P3d 1172 (2014). All subsequent references to *former* ORS 135.747 are to the 2011 version of the statute.

appeal, however, reduces to two questions, both of which implicate narrow legal issues: Was defendant denied the speedy trial guaranteed to him by statute? And, if not, did the trial court err in ruling on the scope of hunting rights reserved by the Nez Perce under the 1855 treaty? The following historical and procedural background focuses exclusively on what is relevant to those questions.[2]

Defendant killed (*i.e.*, "took") two bighorn sheep on Bureau of Land Management (BLM) public land, south of the Powder River in eastern Oregon. After each take, at the insistence of a taxidermist whom he sought to employ, defendant brought the sheep to the Oregon Department of Fish and Wildlife (ODFW) for tagging and record keeping. Because defendant did not have one of the rare permits to take a bighorn sheep, the state charged him by information with four misdemeanor counts under ORS 498.002(1).[3]

The state filed the charges against defendant in November 2008. Defendant, by letter, entered a plea of not guilty in December 2008 and was later arraigned on March 2, 2009. After the arraignment, the court scheduled a pretrial conference for March 30, 2009. Then, on April 1, 2009, defendant filed a motion to transfer the case from state to federal or tribal court, asserting that he is an enrolled member of the Nez Perce tribe and was hunting under rights reserved by the 1855 treaty between the Nez Perce and the United States. The rights secured to the Nez Perce by that treaty include the "privilege of hunting, gathering roots and berries, and pasturing their horses and cattle upon open and unclaimed land."[4]

---

[2] Much of the relevant background is undisputed for purposes of appeal. To the extent that disputes exist, they are addressed more fully within our discussion of particular assignments of error.

[3] ORS 498.002(1) provides:

"Wildlife is the property of the state. No person shall angle for, take, hunt, trap or possess, or assist another in angling for, taking hunting, trapping or possessing any wildlife in violation of the wildlife laws or of any rule promulgated pursuant thereto."

[4] Article 3 of the 1855 treaty provides, in part:

"The exclusive right of taking fish in all the streams where running through or bordering said reservation is further secured to said Indians: as also the right of taking fish at all usual and accustomed places in common with citizens of the territory, and of erecting temporary buildings for curing,

In May 2009, the state filed a memorandum opposing the motion to transfer, and it also filed a motion *in limine* to prevent defendant from asserting Indian treaty rights as part of his defense. The state took the position that the sheep had been killed south of "ceded land"—that is, land once occupied by the Nez Perce but "cede[d], relinquish[ed] and convey[ed]" to the United States in the 1855 treaty. In the state's view, any hunting rights reserved by the treaty were limited to ceded land, and the state sought to preclude defendant from offering evidence that he had "a treaty hunting right to hunt off-reservation and outside of lands ceded to the United States."

On June 19, 2009, the court held a hearing on the parties' motions; it ultimately denied the motion to transfer and excluded evidence that the Nez Perce had treaty rights to hunt beyond ceded lands. At that motions hearing, the court and the parties also discussed the fact that they were unlikely to go to trial on their scheduled date (at that point, July 8, 2009) because of higher priority cases on the docket. After discussing scheduling issues with the parties, including considerations such as defense counsel's work schedule in Alaska and the difficulty of ODFW witnesses attending a trial during hunting season, the trial court rescheduled the trial date for October 15, 2009.

Defendant's trial began on October 15, 2009, as scheduled. At the outset of trial, defendant asked the court to reconsider its pretrial ruling excluding evidence of treaty rights to hunt beyond ceded lands. The court adhered to its earlier order on the state's motion *in limine* and explained that the treaty itself would be admissible only if the evidence showed that the sheep were killed on ceded lands. Consequently, the parties anticipated that the focus of the trial would be on the location of the kill sites—*i.e.*, where the kills occurred in relation to the Powder River, the southernmost boundary of the land ceded by the Nez Perce. North of the mouth of the river was ceded land; south of the river was not.

together with the privilege of hunting, gathering roots and berries, and pasturing their horses and cattle upon open and unclaimed land."

However, at the end of the first day of trial, after the parties had given opening statements and the state had presented two witnesses, the trial court expressed second thoughts about the role that the treaty might play in the jury's consideration of the case. The court explained that it planned to read the treaty again that night and would work on crafting jury instructions.

When trial resumed the following day, the court informed the parties that, while researching the treaty question overnight, it had discovered a case from Washington, *State v. Buchanan*, 138 Wash 2d 186, 978 P2d 1070 (1999), that caused the court to reconsider its earlier ruling on the motion *in limine*. In particular, the trial court explained that, based on the analysis in *Buchanan*, it had changed its view of the scope of hunting rights under the treaty: Rather than being limited to open and unclaimed areas within the land ceded by the Nez Perce, the hunting rights secured by the treaty encompassed all open and unclaimed land on which the Nez Perce had previously hunted, regardless of whether that land had been ceded by the tribe.

The court and the parties then engaged in a colloquy about how to proceed in light of the mid-trial change in the court's understanding of the treaty rights. The trial court ultimately decided to send the jury home and to set the matter for another hearing on how to move forward. At that subsequent hearing, which was held in November 2009, the trial court declared a mistrial. The court explained that it had made a mistake when ruling on the pretrial motion regarding the scope of the treaty, and it further concluded that the mistake prejudiced both sides in trying the case, thereby necessitating a mistrial.

After granting the mistrial, the court scheduled an all-day hearing for January 13, 2010, to reconsider the scope of the right to hunt under the treaty. In anticipation of that hearing, the parties filed additional motions and supplemental briefing, including a motion by defendant to dismiss the charges based on his hunting rights as a member of the Nez Perce.

At the hearing, the parties put on evidence related to the scope of hunting rights retained by the Nez Perce

under the 1855 treaty. After that evidence had been presented, the court stated:

> "In this particular case—and this is what persuades me the very most in a factual basis. In this particular case, it's 18 miles maximum from the lowest line that everyone agrees on the maps and everything else, from the State's point, of land that's ceded. It's 18 miles at the very south of that that [defendant] was supposed to have had the kill site.
>
> "If I'm to interpret it—and I understand I am, and I will do, what the Indians understood in 1855 to what was meant—if everyone at the most—if I accepted the State's viewpoint, they're within 18 miles of that site with their arguments, or it's just a little bit more than that.
>
> "* * * * *
>
> "There's been testimony today from people that talk about, historically, they have known that their relatives have hunted in this area. I believe, as in *Buchanan*, [defendant] has a right to present evidence that he has a right to hunt in that area. I think the State has a right to use evidence as to why there is a conservation basis why he can't do it.
>
> "* * * * *
>
> "I'm going to deny [the state's] motion *in limine* because I think [defendant] is entitled to present that evidence. I am just going to mention at the same time, I'm not going to grant a motion to dismiss, because, as in [*Buchanan*], that wasn't the appropriate thing to do."

In other words, the court ruled that defendant was entitled to present evidence of his right to hunt under the treaty, but that, because treaty rights might nevertheless be subject to state regulation in the interest of conservation, an outright dismissal was not the appropriate remedy. *See Antoine v. Washington*, 420 US 194, 207, 95 S Ct 944, 43 L Ed 2d 129 (1975) (although treaty rights cannot be qualified by states, "'the manner of fishing (and hunting), the size of the take, the restriction of commercial fishing (and hunting), and the like may be regulated by the State in the interest of conservation, provided the regulation meets appropriate standards and does not discriminate against the Indians'" (quoting

*Puyallup Tribe v. Department of Game*, 391 US 392, 397-98, 88 S Ct 1725, 20 L Ed 2d 689 (1968))).

However, because the court's remarks suggested that the ultimate factual determination regarding historical hunting grounds was to be made by the jury rather than the court, both the state and defendant sought clarification. The following colloquy ensued:

"[PROSECUTOR]: So Judge, I think the point of [defense counsel's and my] motions would be that it's not a jury question. If the treaty applies to this land, what the State's alleging the kill sites, then the treaty applies, but it's not a jury question. So are you saying, as a matter of law, you're determining that the treaty applies—

"THE COURT: Well, I think, as I read this case [*Buchanan*], as I'm reading how I think it's to be applied, the Defendant should have an opportunity to prove that the area where he is supposed to have shot these animals is an aboriginal hunting ground for the Nez Perce. I think that's right. And I think it is an issue that a jury can determine. If you want me to determine an issue, I can, and I will today.

"[PROSECUTOR]: Yes, I would.

"* * * * *

"THE COURT: I believe it is. * * *. *I would say it is—he has proven to me that it is an actual area used for hunting and occupied by the Nez Perce.*

"And that it is consistent with what was said in the negotiations, and told by Governor Stevens to the Indians that they could go ahead and hunt. And I think that the restriction that I think should apply is the restriction that was given in *Buchanan*, and that's what I applied because, I think, within those 18 miles [from ceded land], it only makes sense that they would have used it, with the facts that were given. Okay?

"[PROSECUTOR]: So as a matter of law, the treaty applies to the kill site.

"THE COURT: *What I'm saying is, it's not in the territory that was ceded to the United States, but it does include the areas that they were hunting and fishing, and I believe the treaty gave them that opportunity to hunt in that area. I*

*don't think that the treaty restricted them just to the ceded area.* I think that's what you're asking for. And I do not believe that that's what was required."

(Emphases added.) The court directed defendant's counsel to prepare an order to memorialize the court's rulings, and the parties agreed that they would deal with any remaining issues at a later date.

Subsequently, the parties were unable to agree on the form that the order should take, and the court held a hearing in March 2010 to address the dispute. The court explained that, in addition to an order denying the state's motion *in limine*, defense counsel had also submitted "an order granting Defendant's motion to dismiss, specifically that, based on the Court's findings, the Court finds that [defendant] was acting within his treaty rights in the actions alleged by the State in this case." Defendant then elaborated on his position, arguing that the court "never said out loud" on January 13 that it was "grant[ing] the Defendant's motion, but that's the effect of the findings. And so I believe that that order is correct."

The trial court disagreed with defendant's characterization of the January 13 hearing. The court explained that, although it had waded into factual issues at the parties' request, it had not intended to conclusively resolve factual disputes at that stage in the proceedings. The court then clarified the nature of its January 13 "findings":

"I can understand why [defense counsel] has prepared his motion in that manner, motion to dismiss, because both parties asked me to make that finding. I made that finding at the request of the parties, but I'll correct that finding at this point.

"As far as my viewpoint is, the Court's real finding is, the *Buchanan* case gives the Defendant the opportunity to present the very things that I had ordered back in June of 2009 that he couldn't do, which is what I just signed on the order denying [the] State's motion to limit testimony and evidence. He has a right to present those things.

"Whether he had a right to hunt in that area or not, I think that is ultimately going to be a jury decision. That's truly what I understood that the Court needed to determine

when we were last in court. And so I don't think it's the Court's position or right to say, 'Yeah, [defendant], you definitely can hunt in this area,' because that really wasn't the issue that was ever presented to the Court, but is what both of you asked for at the time.

"* * * My ruling is, he has a right to present it to a jury. So from that end, I don't want to grant the motion to dismiss, because that wasn't ever the Court's intention. It was to give [defendant] an opportunity to present it at a trial. So that's the Court's decision."

(Emphasis added.)

On the preceding day, March 2, 2010, the state had filed an amended charging instrument. The amended information added language to the charges that, according to the state, was intended to better frame the treaty rights question after the court's ruling that hunting rights extended beyond ceded lands. As amended, each count stated that defendant took the bighorn sheep "on open and unclaimed lands and outside of the ceded land area delineated in the defendant's 1855 Nez Perce treaty." At the March 3 hearing, the trial court postponed arraignment on the amended information to give defendant an opportunity to move against it.

Shortly thereafter, defendant moved to dismiss the amended information, arguing, among other contentions, that the trial court had already conclusively decided the scope of treaty rights at the January 13 hearing and that relitigating the issue would subject defendant to double jeopardy; defendant also filed a demurrer to the amended information, raising similar contentions based on the preclusive effect of the court's findings at the January 13 hearing. At a hearing on those issues in April 2010, the court once again explained that it had not intended to make factual findings regarding the scope of the treaty at the January 13 hearing,[5] and it declined to dismiss the charges on double jeopardy grounds.

---

[5] After retracing the procedural history, the court summarized the events as follows:

"When I said that the treaty exists and applies, what I meant was, it exists to the extent that it allows [defendant] to make that argument to a jury, something that the State had asked me not to do. That's what I decided.

The court then turned to the question of demurrer. The parties shared a desire to obtain an appealable order on the question that everyone agreed had been decided at the earlier January 13 hearing—*i.e.*, that hunting rights under the treaty extended beyond ceded land. The trial court initially indicated a willingness to grant the demurrer on that issue, but the prosecutor expressed doubt as to whether a demurrer was the correct procedural vehicle to dismiss the case, considering the amended information. The prosecutor explained that "we've changed the charging document to be in compliance with" the court's ruling regarding the reach of treaty rights, and therefore he "question[ed] whether this demurrer—a demurrer has to say, basically as a matter of law there's not a chargeable offense. You've not said that. You said it's a fact question."[6]

The court explained that it was willing to grant the demurrer if that was how the parties wanted to frame the issue for appeal, but agreed to give the prosecutor additional time to research whether the order would be appealable. After further research, the prosecutor concluded that a demurrer would not frame the issue for appeal. After yet another hearing, this time in July 2010, the trial court agreed with the state and, despite its earlier willingness to grant a demurrer, ultimately denied it.

In the meantime, defendant's trial date had been pushed out continually—ultimately, until April 2011. In anticipation of that trial date, defendant filed additional motions to dismiss in January 2011. One of those motions argued, yet a third time, that the trial court's previous determination

I'm not saying that the treaty—because if you look at *Buchanan*, they talked about reasons why the State can bring restrictions and everything else on that right for [defendant] to hunt in that area.

"What I simply was trying to say is, [defendant] has a right to bring up at trial that the treaty rights exist and that he's claiming under those treaty rights and to make that decision. That's what I was saying then. And if I didn't make it clear, I apologize. I thought I'd tried to make that clear once before."

[6] Although defendant was willing to stipulate that a ruling on the demurrer was appealable, the prosecutor had doubts. He stated, "It is a defense that then the jury has to decide, not as a matter of law does this charging document keep us out—I guess that's my only concern, is I don't know that we've created [an] appealable order, even by agreeing."

that "the Nez Perce had made historical use of this area, and had historically hunted big horn sheep in this area," was dispositive. Defendant also moved for dismissal on the ground that the state had denied defendant the right to a speedy trial under *former* ORS 135.747.[7] In that motion, defendant argued that, by the time of the scheduled trial date of April 19, 2011, it would have been 29 months since the charging instrument was filed, an unreasonable period for bringing misdemeanor charges. The state filed a motion as well, seeking to clarify what jury instructions would be used under the *Buchanan* test previously endorsed by the trial court.

The court heard those additional motions in February 2011. The court denied defendant's various motions to dismiss; as for the speedy trial motion, the court ruled that the 29-month delay—part of which had been occasioned by the fact that the courthouse had flooded—was reasonable. The court postponed any decision on the question of jury instructions until a subsequent hearing.

The court returned to the question of jury instructions at a hearing in early April 2011. By that time, defendant had filed a motion to waive his right to a jury trial, but the parties continued to litigate the issue of jury instructions with the understanding that the trial court would apply the same legal principles in a bench trial. The state had submitted instructions and a special verdict form that, in its view, tracked the language of *Buchanan*. The state's verdict form, which reflected its proffered instructions, set forth three questions:

"1. Was defendant James Bronson on 'open and unclaimed land' at the time he took the bighorn sheep, that is: public land whose use would be compatible with hunting?

"* * * * *

"2. Was defendant James Bronson on land 'ceded' to the United States at the time of the Treaty at the time he took the bighorn sheep?

"* * * * *

---

[7] Although defendant's motion also cited the Oregon Constitution, he does not adequately raise or develop a constitutional speedy trial claim on appeal.

"3. If not on 'ceded' land, was defendant James Bronson on aboriginal hunting lands at the time he took the bighorn sheep? *That is, was the sheep taken at a place that the Nez Perce Tribe historically actually used for hunting and occupied on a regular basis over an extended period of time at the time of the Treaty?*"

(Emphasis added.)

Defendant, meanwhile, objected to the state's instructions, and he proposed multiple alternative instructions. Some of defendant's proposed instructions asserted that the Nez Perce had treaty rights to hunt on *any* open and unclaimed land, regardless of whether they had hunted on that land historically. However, defendant also proposed the following instruction:

"Members of the Nez Perce Nation have hunting rights within the current reservation, on open and unclaimed land within the area ceded the United States after the 1855 Treaty and on open and unclaimed land outside the original reservation *where members of the Nez Perce tribe historically hunted.*"

(Emphasis added.)

At the hearing on the jury instructions, defendant explained that he did not intend to waive his position that *Buchanan* imposes the wrong test for assessing the scope of treaty rights, and he pointed out, among other things, that the requirement that land be "occupied on a regular basis over an extended period of time"—a critical part of the state's definition of aboriginal hunting grounds—was inconsistent with how the Nez Perce lived. He argued:

"I think that for the State to attempt to limit that, that raises questions in my mind that I don't even understand. I don't know what 'occupied' means in the definition of a nomadic people, or 'occupied on a regular basis,' or what's an extended period of time."

Following the hearing, the trial court issued a letter opinion, which it later incorporated in an order, stating that the court "found that the State's prepared jury instructions are correct and it will use the instruction when deciding the case at the scheduled bench trial."

The trial date was reset again, and defendant was eventually tried in a bench trial in late June 2011. At the trial, the state presented evidence that defendant had, in fact, killed both sheep in Oregon, south of the Powder River, beyond the lands ceded by the Nez Perce. The state also presented evidence regarding the historic hunting practices of the Nez Perce with regard to that area south of the Powder River. On the latter point, the state offered expert testimony from Dr. Steven Dow Beckham, an ethnohistorian[8] who had published extensively on the history of the Pacific Northwest and Northwestern tribes. Beckham testified that he was not aware of any historical evidence that the Nez Perce had hunted south of the Powder River or extensively used or occupied that area. Rather, his research and that of others showed that the Wallowa Mountains served as the southern boundary for use by the Nez Perce. He testified that "there isn't any evidence of Nez Perce really hunting in this area north of the Powder up to the Wallowa [River]," let alone south of the Powder River.

The absence of any anthropological or historical evidence of Nez Perce use or occupation of the area south of the Powder River was telling, according to Beckham, in light of the many potential sources of evidence that he had reviewed. One of the most significant sources of historical information was litigation involving the Nez Perce before the Indian Claims Commission (ICC), a federal tribunal established to allow tribes to pursue claims against the United States. Among other claims, the Nez Perce sought compensation before the ICC on the ground that, "at the time of the ratification of the Treaty of 1855[,] the tract of land aboriginally owned by [the Nez Perce] was in excess of that described in the treaty, and of far greater value than the amounts the [United States] agreed to pay."

To prevail on that claim in the ICC, the Nez Perce were required to demonstrate the location of lands where the tribe had exclusive use and occupancy at the time of the 1855 Treaty. Beckham explained that, to make that case before the ICC, the Nez Perce had hired Dr. Vern Ray as

---

[8] Ethnohistory is the study of the development of cultures. *Webster's Third New Int'l Dictionary* 781 (unabridged ed 2002).

their expert witness. According to Beckham, Ray was "the best in the field" and, before the ICC litigation was anticipated, had conducted many interviews in the 1920s with members of the Nez Perce who were living at the time of the 1855 treaty. Beckham testified that "neither the historical documentation nor [Ray's] oral informants identified use or occupancy of that area [south of the Powder River] by the Nez Perce tribe."[9]

Beckham further testified that there were reasons that the Nez Perce did not use the area south of the Powder River. He explained that, although the Nez Perce traveled extensively, particularly after acquiring horses in the early 1700s, "[t]heir primary travel was to the friendly tribes to the west, the north, and the east." The northern areas had more attractive resources[10] and, to the south, the Nez Perce had enemies (especially, the Northern Paiutes) that made that area "contested ground, it was dangerous country." When asked whether, in light of the conflict with the Northern Paiutes, it would "make any sense * * * that the Nez Perce would be wanting to use and occupy that area [south of the Powder River] for hunting," Beckham testified, "Well, it doesn't."

Defendant, meanwhile, offered his own expert, Dr. Alan Marshall, an anthropologist who had studied and worked with the Nez Perce. Marshall opined that the Nez Perce traveled extensively, including into hostile territory, and "in 1855 and prior to that use[d] this area along the Snake River and the area of the Powder River, Burnt River, Weiser River." Defendant also called a tribal member, Elmer Crow, who had been the tribal fish and wildlife commissioner for the Nez Perce. Crow testified that his family had hunted bighorn sheep south of the Powder River, and that

---

[9] Although Ray had helped the Nez Perce to obtain compensation for southern lands beyond the land ceded in the 1855 Treaty on the eastern side of the Snake River—*i.e.*, what is now Idaho, the same was not true on what is now the Oregon side of the Snake River. Beckham explained that, as part of the ICC litigation, Ray would have had every incentive to point to evidence of hunting or other use by the Nez Perce south of the Powder River, and yet he made no mention of any such use.

[10] Beckham testified that the area south of the Powder River "is not identified by Nez Perce elders as a hunting area. It is not a prime resource area. It did not offer beaver, deer, moose, elk, sheep, salmon, or camas."

he had been told by tribal elders that there had been an encampment there, where the Nez Perce traded with the Paiutes.

After the parties had presented their evidence, the court rendered its decision on the record. The court began by explaining that it would "go through the three issues that were part of the special jury verdict—or special verdict form that I had approved previously." After finding that defendant was on open and unclaimed land (the first question) and that defendant was south of ceded land when he took the sheep (the second question), the court explained that

> "[t]he third question is, if not on ceded land, was [defendant] on aboriginal hunting lands at the time he took the bighorn sheep? That is, was the sheep taken at a place that the Nez Perce tribe historically actually used for hunting and occupied on a regular basis over an extended period of time at the time of the treaty of 1855? The answer is no."

The court then explained that it did not find either prong of the test (actual use or occupancy):

> "After a review of all the evidence, this Court finds that the Nez Perce tribe historically did not actually use the area south of the mouth of the Powder River for hunting. It did not occupy it on a regular basis over an extended period of time at the time of the treaty of 1855."

Thus, the court found defendant guilty of each charge and entered convictions on all four counts in the amended information.

## II.  ANALYSIS

Defendant now appeals, advancing three assignments of error. In his first assignment, defendant argues that the trial court should have dismissed the case for lack of a speedy trial under *former* ORS 135.747. In his second assignment, he argues that the trial court should have dismissed the charges, or later acquitted him, on the ground that he was hunting pursuant to rights reserved under the 1855 treaty. And, in his third assignment of error, he argues that the trial court erred in rejecting his requested jury instructions regarding hunting rights.

## A. *Speedy Trial*

We begin with defendant's contention that he was denied his statutory right to a speedy trial pursuant to *former* ORS 135.747. That statute requires the dismissal of an accusatory instrument when a defendant "whose trial has not been postponed upon the application of the defendant or by the consent of the defendant, is not brought to trial within a reasonable period of time." *Former* ORS 135.747. Our review under that statute involves a two-step process: We first "determine the relevant amount of delay by subtracting from the total delay any periods of delay that defendant requested or consented to." *State v. Glushko/Little*, 351 Or 297, 305, 266 P3d 50 (2011). Then, we determine whether that net delay is reasonable. *Id.* at 305.

Defendant argues, as he did in the trial court, that the delay between the filing of the charging instrument in November 2008 and his eventual trial in 2011—a period of almost 3 years—was an unreasonable period of delay, all of which should be attributed to the state. However, after this case was briefed and argued, we issued a decision in another speedy trial case, *Garner*, that undercuts one of the predicates of defendant's argument—namely, that he was not "brought to trial" for purposes of *former* ORS 135.747 until 2011.

In *Garner*, the defendant was charged in September 2006 with misdemeanor driving under the influence of intoxicants and then proceeded to trial nine months later, but that trial ended in a mistrial caused by the state. The trial court then dismissed the complaint against defendant on former jeopardy grounds, but, after a lengthy appellate process, the state obtained a reversal of that ruling. When the case was remanded, and the new trial scheduled for December 2010, the defendant moved to dismiss the case on speedy trial grounds. In litigating the speedy trial question, both parties assumed—like defendant in this case—that, even though an earlier trial had ended in a mistrial, the defendant had not been "brought to trial" for purpose of *former* ORS 135.747 at the time of his motion to dismiss. 253 Or App at 66.

We nevertheless examined the correctness of that assumption and concluded that "the literal command of the statute is satisfied when a defendant's trial is commenced even if that trial ultimately ends in a mistrial and the defendant is retried. Simply put, ORS 135.747 does not apply to retrials following a mistrial." 253 Or App at 69. That is, we concluded that the defendant was "'brought to trial' for purposes of ORS 135.747 in June 2007 even though that trial ultimately ended in a mistrial." 253 Or App at 74.

In light of *Garner*, defendant was "brought to trial" for purposes of *former* ORS 135.747 when trial commenced on October 15, 2009, even though the result was a mistrial. Thus, the total period of delay between the charging instrument in November 2008 and the trial in October 2009 is just over 11 months. Even assuming that defendant did not consent to any of that delay,[11] and that the delay is longer than ordinarily expected for a case involving misdemeanors, we have no difficulty concluding that the delay was nonetheless reasonable in light of the complexity of the issues presented by defendant's theory of defense. As previously set forth, defendant's assertion of tribal hunting rights injected novel issues related to the interpretation of the 1855 treaty (including jurisdictional questions) that are not present in typical misdemeanor cases for wildlife violations. The state actively litigated those issues, and the trial court decided them expeditiously. Under the circumstances, any delay in bringing defendant to trial sooner than October 15, 2009, was reasonable, and defendant was not entitled to dismissal under *former* ORS 135.747.

B. *Treaty Rights*

1. *Demurrer and motions to dismiss or acquit*

Defendant's second assignment of error asserts that the trial court erred "in not dismissing the charges," and then refers to defendant's motions to dismiss, his demurrer, his motion for judgment of acquittal, and his "renewal" at

---

[11] *But see State v. McGee*, 255 Or App 460, 479, 297 P3d 531, *rev den*, 354 Or 389 (2013) (holding that, when a defendant files motions that require pretrial resolution, the defendant is deemed to have applied for or consented to a reasonable period of delay to consider and decide the motion).

the end of trial of previously filed motions.[12] As we understand the common thread of defendant's second assignment of error, it is this: The trial court, at various points, misinterpreted the scope of hunting rights reserved by the 1855 treaty, and, under the correct interpretation of that treaty, defendant had the right to take and possess both bighorn sheep. What is less clear, however, is what defendant believes to be the *correct* interpretation of the treaty.

Throughout trial, and on appeal, defendant has argued that the trial court erred in applying the *Buchanan* test, which, as described above, required a showing that the area in question had actually been used for hunting and occupied on a regular basis over an extended period of time at the time of the treaty. At times, defendant argued that the treaty reserved the right to hunt on *any* open and unclaimed land, regardless of whether the Nez Perce historically had used the land as a hunting ground. At other times, though, defendant appeared to take issue primarily with the "occupancy" requirement in *Buchanan.* Defendant's briefing on appeal is similarly ambiguous, suggesting that treaty rights extend to *any* open and unclaimed land, while at another point stating that *Buchanan* "got most of it right."[13]

At oral argument, however, when asked to clarify his position, defendant's counsel explicitly advanced the view that "open and unclaimed land" referred to land that the Nez Perce historically had hunted, regardless of whether

---

[12] Defendant offers a single "combined" argument, in which he contends that "[t]hese assignments of error all deal with the same issue of reserved hunting rights and [the] assignments of error are simply different points in the procedure where the issue was raised and should have been addressed by the court." That "combined" approach is problematic for purposes of our review. Each of the rulings that defendant challenges—the motions to dismiss, the demurrer, and the motion for a judgment of acquittal—involved different evidentiary records or, in the case of the demurrer, involved only the pleadings. Defendant's argument, meanwhile, appears to challenge both factual and legal determinations by the trial court; in fact, the first three pages of the argument section of defendant's second assignment of error is a summary of the trial court's determinations of law and fact at the January 13, 2010, hearing. As we will discuss, we limit our discussion of defendant's second assignment of error to those arguments that are sufficiently developed and segregated in the brief.

[13] The state, in its response brief, expresses justifiable uncertainty as to "whether defendant agrees that the test in *Buchanan* is correct, or whether he is arguing for an even broader test of treaty hunting rights beyond the ceded lands."

they had also occupied that land. He was asked specifically, "So there is a historic limit—there is a historic limitation?" Counsel responded:

> "I think there—I think there has to be. *** *But that historic use is hunting in this case. It is not occupation,* it's not whether you had permanent housing, campsites and everything else, which is what the state and the state's expert particularly focused on."

(Emphasis added.) Later, defendant's counsel was asked, "But your position is, it still would be limited to the land that they had used historically?" He answered, "I think it is, because that has to be the Indians' understanding at that time."

In light of that clarification, we understand defendant to argue that the trial court erred in interpreting the scope of the treaty because (1) a showing of historic hunting use, as opposed to occupancy, was all that was necessary to prove the extent of hunting rights secured by the treaty; and (2) the evidence establishes, and the court had previously found at the January 13, 2010, hearing, that the Nez Perce had historically hunted in the area in which the bighorn sheep were killed.

Neither of those arguments provides a basis for reversal on this record. First, even assuming that defendant is correct that the *Buchanan* test erroneously imposed an "occupancy" limitation that does not appear in the treaty itself, the trial court found, as fact, that the Nez Perce did not use the area for hunting *or* occupy it. That is, in addition to finding that the Nez Perce "did not occupy [the area south of the Powder River] on a regular basis over an extended period of time at the time of the treaty of 1855," the trial court also specifically found "that the Nez Perce tribe historically did not actually use the area south of the mouth of the Powder River for hunting." And, that finding of fact is amply supported by evidence in the record, including the testimony of the state's expert, who, as described above, explained why "there isn't any evidence of Nez Perce really hunting in this area north of the Powder up to the Wallowa [River]," let alone south of the Powder River.

Despite evidence in the record to support the court's factual finding regarding actual use for hunting, defendant argues that he was nonetheless entitled to judgment as a matter of law based on the trial court's *pretrial* findings— specifically, the court's finding at the January 13, 2010, hearing, that the Nez Perce had used the area south of the Powder River for hunting. According to defendant, that finding established that the treaty applied to the area as a matter of law and precluded any future factfinder from later finding defendant guilty of the charges in this case.[14] However, as set out at length above, 277 Or App at 594-96, the trial court expressly "corrected" the factual finding that it made at that hearing, explaining that it had not intended to conclusively resolve the question on the record before it at that time. Defendant does not develop any argument as to why the trial court was bound by its initial factual finding, and it is not readily apparent to us what principle of law would have prevented the trial court from later reconsidering and, in effect, withdrawing the factual findings that it made at the January 13 hearing. Thus, we have no basis on which to conclude that the findings at the January 13 hearing, later "corrected" by the trial court, compelled that court to rule in defendant's favor as a matter of law.

For the foregoing reasons, we reject defendant's second assignment of error.

2. *Jury Instructions*

In his third assignment of error, defendant asserts that the trial court erred in rejecting certain jury instructions that he proposed concerning treaty rights for hunting. Because defendant waived his right to a jury, we understand defendant to complain that the trial court erred in using the state's jury instructions, which followed the *Buchanan* test, as opposed to applying defendant's formulation of the law. Defendant does not develop any separate argument under that assignment of error, and, in light of the foregoing discussion—specifically, in light of defendant's concession

---

[14] At oral argument, defense counsel explained that "the trial judge in *** January of 2010 specifically found that this was covered, they had hunted, they used it, etc. *** I don't see how you can have that finding together with a finding that the state proved beyond a reasonable doubt that that doesn't apply."

that hunting rights are limited to areas that the Nez Perce had historically used for hunting, coupled with the trial court's factual finding that the Nez Perce did not actually use the area south of the Powder River for hunting—we do not understand how defendant was prejudiced by the trial court's understanding and application of the law in this case.

Affirmed.